**INLEASING CORP.**

v.

**Claude A. JESSUP.**

**No. 81–251–Appeal.**

Supreme Court of Rhode Island.

April 25, 1984.

Reargument Denied May 18, 1984.

John H. Blish, Joseph V. Cavanagh, Jr., Edwards & Angell, Providence, for plaintiff.

Edward W. Moses, Maury A. Ryan, Asquith, Merolla, Anderson, Ryan & Wiley, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is an appeal from a Superior Court judgment in which the defendant, Claude A. Jessup (Jessup), presently finds himself liable as a guarantor to the plaintiff, Inleasing Corp. (Inleasing), for over $1 million. Jessup's appeal presents three issues. They include his effort to amend his answer under Rule 15(a) of the Superior Court Rules of Civil Procedure as well as two significant questions of law, one involving the parol-evidence rule and the oth-

er relating to the scope and existence of an agent's authority.

Jessup, a Virginia resident, was a member of the board of directors and a 20 percent shareholder of a Delaware corporation that owned the entire stock of a North Carolina corporation named Pargo, Inc. (Pargo). Pargo manufactured and leased golf carts. Jessup, a retired chairman of the board of Continental Trailways, has had considerable experience in lending money for various business endeavors. Pargo was one such venture. He invested nearly $2 million in the company.

Inleasing, affiliated with what is now known as Fleet National Bank, is engaged in the business of financing and leasing various types of equipment and machinery. Since Pargo experienced financial difficulty in performing both the manufacturing and leasing functions, it turned to Inleasing for help. Inleasing purchased the carts manufactured by Pargo, providing an instant infusion of cash into the manufacturing concern. Pargo then leased the carts from Inleasing and subleased them to golf courses in the southeastern portion of the United States. This transaction is commonly referred to as a "sale and lease-back" transaction.

Pargo and Inleasing entered into the first of their thirty-three sale and leaseback transactions in April of 1972. By the spring of 1974, Pargo, encountering further serious financial difficulties, had defaulted on several of its lease payments.

In the spring and summer of 1974, Pargo failed to make its monthly payments as obligated. Subsequently, Inleasing came to realize that many of the carts that it had purchased and leased back to Pargo were missing. The lender then began to take an inventory of its carts and immediately found that many of them were either missing, inoperative, or inert while awaiting service at one of the two repair centers maintained by Pargo under the terms of the sale-leaseback agreement. Further negotiations were immediately undertaken by the parties to rectify the situation.

Inleasing refused to continue its relationship with Pargo absent a guaranty by Jessup for the value of the missing carts. The guaranty would assure payment of money to Inleasing under the terms of a collateral note to be executed by Pargo. The value of the note was to be the same as the value of the missing carts.

On December 19, 1974, Jessup, while in Virginia, executed the so-called missing-cart guaranty and delivered it to Charles Bradley (Bradley), Pargo's chief operating officer. However, at the time Jessup signed the guaranty, the exact value of the collateral note to be signed by Pargo was unknown. The specific amount of the note and the guaranty was not determined until a month later when on January 27, 1975, Pargo, through Bradley, signed a note for $1,037,456. This amount was then inserted in the appropriate blank spaces on the guaranty signed by Jessup about a month earlier. Once the insertions were made, the note and the guaranty were delivered by Bradley to Inleasing's representative. This fact is the focal point of Jessup's appeal, for neither he nor his attorney, Frederick Russell (Russell), a member of the Virginia bar, was present at the January 27 "closing" meeting, which took place in Hartford, Connecticut. Present at the meeting were Bradley, Inleasing's president, and its counsel.

Jessup insists that he did not know that the ultimate value of the note would be so high as it was, and he contends that he would never have guaranteed such an amount. However, Jessup's ability to present this theory was hampered by the trial justice's refusal to allow him to amend his answer to the complaint.

Jessup's initial answer, filed in October 1975, pleaded three affirmative defenses, specifically, (1) insufficient service of process, (2) lack of jurisdiction over the subject matter, and (3) lack of jurisdiction over the person. In April of 1979, he moved to amend his answer under Super.R.Civ.P. 15(a) to include the defenses of fraud or

misrepresentation. The Superior Court justice who heard this motion cursorily denied it without explanation.

When the case came on for trial, Jessup attempted unsuccessfully on several occasions, both before and during the trial, to amend his answer to include the defenses of fraud, misrepresentation, or mistake. The trial justice's rationale for rejecting these attempts was that Jessup's trial motions were no different from the earlier motion that was denied by a justice in charge of the motion calendar.

Rule 15(a) provides that after a pleading has been served, it may be amended "only by leave of [the] court or by written consent of the adverse party; and leave shall be freely given when justice so requires." It is modeled after Rule 15(a) of the Federal Rules of Civil Procedure.

We have held that it is this final sentence of the rule which embodies its true spirit. *Kenney v. Providence Gas Co.,* 118 R.I. 134, 140, 372 A.2d 510, 513 (1977). In the past we have emphasized the desirability of permitting the desired amendments and having the dispute resolved on its merits and not by a blind adherence to procedural technicalities. *Id.;* 3 Moore, *Federal Practice* ¶ 15.02 at 15–13 (2d ed. 1983).

■ The opportunities we have had to interpret the rule indicate that liberality in allowing amendments is to be favored. In *Ricard v. John Hancock Mutual Life Insurance Co.,* 113 R.I. 528, 324 A.2d 671 (1974), we addressed a motion to amend made at trial and noted the deference paid the trial court in such a situation.

"The granting or denial of such a motion is a matter within the sound discretion of the trial justice, and when he has acted in the exercise of his discretion his ruling should not be disturbed on review in the absence of a clear showing that he abused his discretion." *Id.* at 540, 324 A.2d at 677.

In *Ricard* the defendant Industrial National Bank originally admitted that the defendant John Hancock was indebted to it under the terms of the plaintiff's life insurance policy. At trial the bank desired to change this theory and force the plaintiff to prove the indebtedness.

The trial justice denied the amendment because he felt "that the case had gone on too long on the basis of the pleadings as they were at the time of trial." *Id.* at 539, 324 A.2d at 677. In faulting the trial justice, this court ruled that the trial justice's denial was a clear abuse of his discretion.

■ We reach the same conclusion here. The dismissal of the motion to amend in the first instance was summary and at trial unpersuasive. The burden rests on the party opposing the motion to show a compelling reason warranting dismissal, such as substantial prejudice. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). At no time in the Superior Court was this burden sustained.

Inleasing's only reason for objecting to the grant of the motion was its claim that the sole purpose for the motion was to delay Jessup's day of reckoning. Our review of the record indicates that there is no such basis for this assertion. Jessup's desire was to amend his answer so that he could present at trial the affirmative defenses related to fraud, misrepresentation, or mistake.

Inleasing claims that no excuse exists for the failure to amend the answer from the date the answer was initially filed until just before trial. It infers a dilatory motive from the fact that defendant's actions occurred shortly after a thirty-day trial notice.

■ However, mere delay is not enough to deny the amendment. In *Howey v. United States,* 481 F.2d 1187, 1190 (9th Cir.1973), the court found no reason to deny an amendment by the plaintiff even though it was offered on the second day of trial and five years after the action was commenced. No prejudice was shown, and the motion was granted.

Together with *Ricard* and *Kenney,* our holding in *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972), which allowed the amendment after trial, conclusively indicates our determination to permit such amendment absent a showing of extreme prejudice. The sentiments we have expressed here relative to the amendment of pleadings were recently affirmed in *Kuczer v. City of Woonsocket,* 472 A.2d 300 (R.I. 1984), and *Serra v. Ford Motor Credit Co.,* — R.I. —, —, 463 A.2d 142, 150 (1983).

No substantial prejudice is indicated by the allowance of the requested amendment. When the request was originally made in April 1979, the trial had not commenced; in fact, it did not commence until late November 1979. The obvious purpose of the amendment was to afford an opportunity to Jessup to show that there was no meeting of the minds about the amount of the guaranty. It is our belief that justice will be served by a remand and an amendment of Jessup's answer to include the grounds of fraud, misrepresentation, and mistake.

We next address ourselves to the parol-evidence rule. Jessup's claim is that he was totally unaware that the amount of the note would be anywhere near $1 million, and that the amount was indeed much larger than he had ever anticipated when he signed the blank guaranty. In an attempt to demonstrate this lack of awareness, a question was posed to Inleasing's president asking whether he "recalled" that any amounts (other than the $1 million figure) were discussed "prior to the Hartford meeting." An objection to this inquiry was sustained under the parol-evidence rule.

■ This rule states that "in the absence of fraud or mistake, parol evidence of prior or contemporaneous agreements is generally inadmissible for the purpose of varying, altering or contradicting a written agreement." *Fram Corp. v. Davis,* 121 R.I. 583, 586–87, 401 A.2d 1269, 1272 (1979); *see also Industrial National Bank v. Peloso,* 121 R.I. 305, 310, 397 A.2d 1312, 1314 (1979). This is a substantive area of the law, not procedural or evidentiary, and

it attaches when "parties to a contract have adopted a written agreement as the final expression of their intention in regard to a portion of or the entire subject matter of the transaction * * *." *Fram Corp.,* 121 R.I. at 587, 401 A.2d at 1272.

Although established as a rule, the bar against the use of parol evidence is a doctrine with many exceptions. Indeed, its very definition states that it does not apply in the absence of fraud or mistake. This exception is, of course, sensible. It would be impossible to prove fraud or mistake if the only admissible contract is the final one; the fraud would not be apparent from the face of the instrument.

■ The application of the rule in situations alleging fraud or mistake is best explained by Professor Corbin. He decries the nomenclature of the doctrine as a rule.

"The use of such a name for this rule has had unfortunate consequences, principally by distracting the attention from the real issues that are involved. These issues may be any one or more of the following: (1) Have the parties made a contract? (2) Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate 'integration' of that contract?" 3 *Corbin on Contracts,* § 573 at 358–59 (1960).

If any of these issues is a subject of the litigation, then there is no parol-evidence rule to be applied. "On these issues, no relevant evidence, whether parol or otherwise, is excluded." *Id.* at 360. *See also Jay Realty, Inc. v. Ahearn Development Corp.,* 189 Conn. 52, 453 A.2d 771 (1983).

■ Consequently, the exception for fraud or mistake is directly applicable to the theory of the defense. By amending his answer to assert the defenses of fraud, misrepresentation, or mistake, Jessup sought to demonstrate that at no time when he executed the guaranty was he led to believe that the value of his guaranty would exceed $500,000. The line of inquiry

being asked of Inleasing's chief executive would certainly have been probative of the reason why Jessup did not honor the $1 million guaranty. Jessup has no quarrel with a half-million-dollar guaranty. However, in the parlance of the golfing world, he obviously believes that a $1 million guaranty represents a completely different golf game—something akin to a golfer with a 12 handicap who arrives at the eighteenth tee leading the field in the club's annual tournament and suddenly learns that the tournament committee, during his walk to the tee, has reduced his handicap to 2.

Inleasing asserts that Jessup was not harmed by the sustaining of his objection. It notes that Jessup himself testified that he thought the notes would be in the $500,-000 range and that the trial justice was therefore well aware of the respective positions of the litigants.

However, Jessup's statement certainly does not put the full impact of his defense before the court. The injury to Jessup's cause lies in his inability to present to the trier of fact his version of what happened during an interstate transaction based on a blank guaranty that in Jessup's eyes ballooned with a few swipes of the pen from a half million to over a million dollars' indebtedness.

The final phase of this appeal concerns the issue of his agent's authority and, indeed, the very existence of an agency relationship. As we have noted, Jessup was not present when the note was signed. In fact the record indicates that the note was signed by Bradley for Pargo and that no one who was present at the Hartford meeting ever informed Jessup of the final amount. Inleasing's attorney offered testimony that at the Hartford meeting Bradley called Russell, Jessup's attorney, in Virginia and informed him of the $1 million amount. At trial when Russell was asked by Jessup's trial counsel if he had authority to assent to the $1 million figure, an objection to the question was sustained notwithstanding an offer of proof that the answer would be negative.

In sustaining the objection, the trial justice observed that since Russell denied ever learning of the $1 million figure, any question about his authority in this area was irrelevant. We believe that the trial justice's rationale is somewhat faulty. In his findings of facts, the trial justice stated that "an examination of the evidence satisfies the Court that the defendant by his attorney was aware of the amount of the collateral note before it was executed and the guaranty delivered." Clearly, the trial justice imputed knowledge of the amount of the note to Jessup because of the alleged phone call made by Bradley to Russell. In taking this approach, the trial justice obviously applied the concept of agency. Yet he reaches this conclusion without benefit of the response of Jessup's attorney about the extent of his authority.

The critical issue is whether Russell, as Jessup's attorney, had any authority to bind his client to a guaranty of $1 million. His testimony on this question was not only relevant but also quite probative. *Rea v. Ford Motor Co.*, 355 F.Supp. 842 (W.D.Pa.1972); *Nadeau Lumber, Inc. v. Johnson*, 138 Vt. 556, 420 A.2d 115 (1980).

Inleasing insists that this entire area of inquiry is irrelevant. It argues that the amount of the note is immaterial because Jessup signed an unlimited guaranty. Once Jessup signed the guaranty, Inleasing contends, any amount ultimately included in the note would be covered.

However, this argument ignores one crucial aspect of the case. Jessup was not a party to the note; Pargo was. Therefore, Inleasing seeks to make Jessup bound by a note although he had no part in its preparation. Professor Williston expressed the danger inherent in such a position.

" 'If a writing not in existence when a memorandum is signed may be considered by way of amplification of such memorandum, and the terms of the later writing be made binding upon the party

to be charged by the memorandum though he had no part in the preparation of the later writing, there would be presented a situation wherein certainty of contract would be thrown to the winds, and opportunities for fraud and imposition would be open and notorious.'" 4 Williston, *Contracts* § 581 at 139 (3d ed. 1961).

*See also Tutko v. Banks,* 167 So.2d 110 (Fla.Dist.Ct.App.1964).

This court has implicitly recognized the possibility of this danger, although in an agency situation. In *H.W. Ellis, Inc. v. Alofsin,* 87 R.I. 252, 140 A.2d 131 (1958), the plaintiff was a painting contractor who sued the defendant for $1,149.10, the cost of painting a house owned by the defendant. The defendant denied any obligation to pay this amount, claiming that the plaintiff's foreman assured him that the cost would not exceed $550.

Noting the business problems that flow from an agency situation, this court held that "[t]he defendants had the burden of proof on the issue of the authority of the foreman to make such a contract." *Id.* at 254, 140 A.2d at 131–32. The rationale behind this holding is as much common sense as legal doctrine. "[I]t was inconceivable that plaintiff would grant such authority, as one bad contract 'could easily put him out of business.'" *Id.* For this same reason, Inleasing must show that Jessup's attorney could bind his client to the $1 million amount. *Scott v. Purcell,* 490 Pa. 109, 415 A.2d 56 (1980).

The extent of Russell's authority plays a pivotal role in Jessup's refusal to pay the $1 million plus sought by Inleasing. At trial Jessup testified both that he was told by a representative of Inleasing that Pargo's missing-cart indebtedness was approximately $500,000 and he signed the blank

guaranty on the basis of this figure. Perhaps Jessup's attorney on the evening when the deal was closed in Hartford was told of the $1 million figure, but before Inleasing is entitled to the amount set forth in the note, it must prove that the attorney had the authority to approve the placement of the $1 million-plus figure into the guaranty. Absent such proof, simple justice requires that this issue and the others to which we have previously alluded be redetermined.

The defendant's appeal is sustained, the judgment entered on the missing-carts guaranty is vacated,[1] and the case is remanded to the Superior Court for amendment of the plaintiff's answer and a new trial.

1. The complaint filed by Inleasing in this controversy contained two counts. One concerned the December 1974 missing-carts guaranty, and the second count related to a July 1974 guaranty that dealt with the payments due Inleasing for equipment leased to Pargo and the obligations set forth in a document entitled "Restructured Lease Agreement." The second count was tried before a Superior Court jury, which returned a verdict for Inleasing for $452,466. Jessup takes no issue with the jury's award. His sole concern is with the missing-carts $1 million-plus judgment.