**BOURDON'S, INC.**

v.

**ECIN INDUSTRIES, INC., et al.**

No. 95–486–Appeal.

Supreme Court of Rhode Island.

Dec. 16, 1997.

Wayne Kezirian, Cranston, for Plaintiff.

Edward J. Mulligan, Lincoln, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of the plaintiff, Bourdon's, Inc., from a judgment in favor of the defendants, Ecin Industries, Inc., Harvey J. Bigelow, and Patricia M. MacMillen, on the plaintiff's claim of breach of contract, and in favor of the defendants on their counterclaim for misrepresentation, fraud, and/or deceit. For the reasons set forth below, we affirm the judgment of the Superior Court. In doing so, we hold that the applicable period of limitations for actions for fraud and deceit is the ten-year period found in G.L.1956 § 9–1–13(a), and we further hold that the Statute of Frauds, § 9–1–4, is inapplicable to a claim of misrepresentation, fraud, and/or deceit. The facts insofar as pertinent to this appeal follow.

### Facts and Procedural History

The plaintiff is a New Hampshire corporation whose president and majority stockholder is John D. Bourdon (Bourdon). In 1986, plaintiff, which was engaged in the "manufacture and sale of mattresses, institutional bedding, and sleep equipment," owned three subsidiary corporations (collectively Subsidiary) that sold mattresses primarily to retail furniture stores. The plaintiff, Subsidiary's corporate parent, supplied bedding to such institutions as hospitals, nursing homes, and hotels.

In August of 1986, defendants Patricia M. MacMillen (MacMillen) and Harvey J. Bigelow (Bigelow) began negotiating with Bourdon for the purchase of Subsidiary, having previously incorporated Ecin Industries, Inc. (Ecin), for the purpose of selling bedding and other products. MacMillen was sole shareholder and president of Ecin, while Bigelow served as vice president and secretary. The parties executed an agreement of sale (Agreement), and a closing was held on December 16, 1986.

Pursuant to the Agreement, Ecin agreed to pay a total purchase price of $200,000, with a $1,000 down payment and $199,000 financed without interest by plaintiff, to be paid in monthly installments of $3,500. Ecin executed a promissory note (Note) to plaintiff; the purchase price was secured by Ecin's newly acquired inventory, machinery, and equipment, MacMillen's car and residence, Ecin's casualty insurance, and the personal guarantees of MacMillen and Bigelow. Part of the purchase price was allocated by the parties to Subsidiary's customer lists (customer lists), which were supposed to be appended to the Agreement as Exhibit C. The customer lists, however, were not attached to the Agreement at the closing, and the parties introduced conflicting versions of the list into evidence at the trial. The most important customers in dispute were the State of Rhode Island (State) and Johnson & Wales University (J & W). The Agreement also contained the following noncompetition clause:

"For a period of fifty-seven (57) months from the date hereof, or until Buyer shall no longer be in business, whichever shall come first, Seller shall not sell to customers on the Customer Lists or to retail furniture dealers in Rhode Island or Massachusetts south of Boston, except that Seller may sell to [enumerated furniture stores] and any hospital and nursing home accounts."

A handwritten insertion point and the term "(Exhibit C)" appeared after the word "Lists."

Following the closing, Ecin moved the Subsidiary operation to its Fall River, Massachusetts facility. Bourdon visited the facility at least monthly to collect payment in accordance with the Note. MacMillen and Bigelow testified that during negotiations prior to the execution of the Agreement, Bourdon orally agreed that he would use Ecin as a subcontractor to manufacture mattresses and futons to be sold by plaintiff. Bigelow claimed that Bourdon had agreed to furnish such business for "[f]ive years at least." Relying on this alleged representation, Ecin purchased futon-production equipment from plaintiff, for which Ecin otherwise had no use. MacMillen and Bigelow also testified that Bourdon had represented to them that the business derived from plaintiff's subcontracting would yield Ecin at least $800,000 per year. During Bourdon's visits to collect payment on the Note, MacMillen and Bigelow claimed that, in response to their inquiries about the promised subcontracting orders, Bourdon would answer that plaintiff's business was slow, that the work was forthcoming, or that Ecin's production capacity was not large enough to handle plaintiff's orders. In order to accommodate the alleged promised larger orders, and with Bourdon's knowledge that they were doing so, defendants expanded the Ecin factory by 18,000 square feet in September of 1987. Ecin, however, never received more than $40,000 annually in business from plaintiff, and in 1989 the amount was only $72. Bourdon, on the other hand, denied making any oral representations.

On January 1, 1989, less than twenty-five months after the execution of the Agreement, plaintiff sold its institutional-mattress business to a corporation formed by two long-term plaintiff employees. This new corporation, Bourdon's Institutional Sales, Inc. (BIS), bought and leased equipment and premises from two other corporations of plaintiff's, Diversified Products, Inc., and J.D. Bourdon Realty. Pursuant to the contract of sale, BIS agreed to hire "Bourdon" as a consultant for the sum of $30,000 per year until 1994. Bourdon was listed on the BIS articles of incorporation as a director, and "John D. Bourdon, d/b/a J.D. Bourdon Realty" was listed as a party to the contract of sale. Bourdon testified that it was plaintiff corporation, and not himself personally, that was hired as the BIS consultant, and he claimed that he never performed any consulting work for BIS, never did any sales work for BIS, and never received notice of or attended any board meetings of the new corporation.

Beginning in 1990, the owners of BIS began making bids on State contracts. MacMillen testified that Bourdon, when reminded of the noncompetition clause in the Agreement, informed her that he had sold the mattress portion of plaintiff corporation to BIS, and that plaintiff itself was therefore not competing against Ecin for the State contracts. In August 1989, BIS also began doing business with J & W after purchasing plaintiff's institutional mattress supply business. In November 1990, Ecin stopped making monthly payments pursuant to the Note because, in MacMillen's words, "[Bourdon] sold the business that he promised to us to someone else." The parties stipulated at trial that a principal balance of $36,882 remained on the Note at the time payments ceased.

On March 25, 1992, plaintiff filed suit against defendants in Superior Court, alleging that defendants had failed to pay on the Note, and had breached the Agreement by having failed to pay for machinery and goods delivered to them. On April 27, 1992, defendants filed an answer to the complaint, setting forth the affirmative defenses of failure to state a claim upon which relief could be granted, lack of personal jurisdiction, improper service of process, and breach of contract. On June 1, 1995, defendants moved to file an amended answer and counterclaims, seeking to add both the affirmative defense of fraud and/or deceit, and two counterclaims, the first for misrepresentation, fraud, and/or deceit (hereafter referred to as the counterclaim for fraud), and the second for deceptive trade practices. Over plaintiff's objection, the trial justice granted defendants' motion on June 9, 1995.

After the close of evidence, the trial justice granted judgment as a matter of law for plaintiff on defendants' counterclaim of de-

ceptive trade practices. Following deliberations, the jury returned with a special verdict form prepared by the trial justice, finding for defendants on plaintiff's claim of breach of contract, and for defendants on their counterclaim for fraud. With damages set at $59,600, plus interest at 12 percent per annum, in the amount of $23,039.89, plaintiff was adjudged to owe defendants the sum of $82,639.89. Judgment on the verdict was filed on June 14, 1995.

The plaintiff filed a motion for a new trial on June 20, 1995, claiming that the verdict was against the preponderance of the evidence, that the verdict form was defective and misleading, that the trial justice had committed an error of law in refusing to give certain jury instructions, and that the trial justice had committed an error of law in permitting defendants to amend their answer and to add their counterclaims. The motion for a new trial was heard on July 5, 1995, although the record before us contains no transcript of that hearing. The motion was denied, and plaintiff filed a timely notice of appeal.

### Defendants' Motion to Amend Their Answer and to File a Counterclaim

The plaintiff has argued that it was reversible error for the trial justice to allow defendants to amend their answer and to add a counterclaim for fraud after the trial had begun. Rule 15(a) of the Superior Court Rules of Civil Procedure provides that a party may amend its pleading once, within enumerated time periods, as a matter of right. After either that opportunity has been taken or the applicable time period has lapsed, a pleading may be amended "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Id.* As Professor Kent has pointed out:

"Rule 13(f) provides that by leave of court a party may set up by amendment a counterclaim which he has omitted through 'oversight, inadvertence, or excusable neglect, *or when justice requires.*' Justice has been held to require the allowance of an amendment to plead a compulsory counterclaim, even though the neglect in-

volved was characterized as 'inexcusable.' * * * Such liberality is justified where the omitted counterclaim is compulsory, as a judgment in the main action will preclude an independent action on the omitted claim." 1 Kent, *R.I. Civ. Prac.* § 13.8 at 133–34 (1969).

■ This Court has favored liberality in allowing amendments and "has consistently held that trial justices should liberally allow amendments to the pleadings." *Serra v. Ford Motor Credit Co.,* 463 A.2d 142, 150 (R.I.1983). In *Inleasing Corp. v. Jessup,* 475 A.2d 989, 992 (R.I.1984), for example, we observed that this permissive rule promotes the important goal of resolving disputes on their merits rather than through blind adherence to procedural technicalities. The granting or the denial of a motion to amend is within the discretion of the trial justice, and this Court will not disturb such a ruling absent a clear showing that such discretion was abused. *Id.* (citing *Ricard v. John Hancock Mutual Life Insurance Co.,* 113 R.I. 528, 540, 324 A.2d 671, 677 (1974)). Moreover, this Court has consistently permitted amendments to pleadings "even after trial 'absent a showing of extreme prejudice.'" *Mikaelian v. Drug Abuse Unit,* 501 A.2d 721, 722 (R.I.1985) (quoting *Inleasing Corp.,* 475 A.2d at 993).

■ The plaintiff in the case before us claimed that it was prejudiced by the allowance of the amendment because fraud was alleged after three trial notices had been issued and more than three years after the commencement of the case. The plaintiff further argued that allowing the amendment dramatically changed the tenor of the case, converting it from a "rather straight-forward collection action on a note" into a complicated, fact-intensive case involving allegations of fraud and oral agreements.

This Court has held that "mere delay is not enough to deny [an] amendment." *Inleasing Corp.,* 475 A.2d at 992. In *Inleasing Corp.,* for instance, we concluded that it was an abuse of discretion for the trial justice not to allow the defendant to amend his answer even though the motion to amend was made after a thirty-day trial notice had been issued

and more than three years after the initial answer was filed. *Id.; see also Ricard,* 113 R.I. at 539, 324 A.2d at 677, (determining that trial justice abused his discretion by denying motion to amend when his only reason was that "the case had gone on too long on the basis of the [original] pleadings"; *Wilkinson v. Vesey,* 110 R.I. 606, 633–34, 295 A.2d 676, 692 (1972) (allowing amendment after start of trial).

In the case at bar, defendants moved to amend their pleading and add their counterclaim a week before the trial commenced. The plaintiff claimed that it was prejudiced by this late amendment, but at no point did it request a continuance in order to pursue additional discovery or otherwise prepare a defense to the counterclaim. *See Mikaelian,* 501 A.2d at 723 (noting as significant the plaintiff's failure to request continuance following granting of a defendant's motion to amend). Although plaintiff asserted that it was unfairly prejudiced by the change in the course of the trial resulting from the amendment, the trial justice noted that "[s]ome evidence seems to support legitimate inferences that the plaintiff should have expected defendants' defense; and, therefore, the allowance of the amendment, even at this late date, does not prejudice the plaintiff."

▮ The plaintiff averred more specifically that it was prejudiced by the late amendment because the trial justice postponed ruling on the motion to amend until after the start of the trial. In addition, plaintiff claimed it suffered a tactical disadvantage because it had made its opening statement prior to the trial justice's determination to allow the counterclaim, whereas defendants had reserved their opening and were able to present the fraud issue to the jury for the first time. But our examination of the record disclosed the following exchange:

"THE COURT: [Plaintiff's counsel] indicated to me that the lateness of the filing of the motion would put him in a position of being prejudiced thereby. What I suggested was rather than have a trial within a trial or a trial before a trial, that I should listen to some of the evidence and I would decide on the motion at that time. Is that correct?

"[DEFENSE COUNSEL]: Yes, your Honor.

"THE COURT: [Plaintiff's counsel], is that a fair statement?

"[PLAINTIFF'S COUNSEL]: Yes, your Honor.

"THE COURT: You had no objection, either one of you, to my doing that?

"[PLAINTIFF'S COUNSEL]: No, your Honor.

"[DEFENSE COUNSEL]: No, your Honor."

It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court. *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950, 959 (R.I.1994). Because plaintiff did not request a continuance to prepare a defense or to seek further discovery, we hold that plaintiff's objection to the amendment was waived. Therefore, the trial justice did not abuse his discretion in granting the motion to amend, and hence we shall not disturb his ruling. We are of the opinion, however, that had plaintiff requested it, plaintiff would have been entitled to a continuance because the amendment here completely modified the cause of action.

### Statute of Limitations for Fraud

The plaintiff also asserted that the one-year period of limitation provided by § 9–1–14 for "words spoken" should govern defendants' counterclaim for fraud because defendants alleged that Bourdon had defrauded them through oral misrepresentations. In its brief to this Court, plaintiff set forth an extended analysis of the interplay between a statute of limitations and the prosecution of a claim governed by that limitations period, depending on whether the claim is posed as a counterclaim seeking affirmative relief or merely as an affirmative defense. The plaintiff then urged this Court to adopt the rule, apparently followed by a majority of other jurisdictions, that in the event a defendant's claim would be barred by the applicable statute of limitations if it were raised as an independent cause of action, then that claim may be used only as an affirmative defense

or offset and should be time-barred if raised as a counterclaim seeking affirmative relief.

■ Our analysis calls for a different conclusion: we hold that the statute of limitations for fraud and deceit is the general ten-year period for civil actions pursuant to § 9–1–13(a), which period clearly had not run at the time the suit was filed or even when defendants moved to amend their pleadings and to add their counterclaim.

Under the section heading, "Limitation of actions for words spoken," § 9–1–14(a) provides, "Actions for words spoken shall be commenced and sued within one (1) year next after the words spoken, and not after." The official headnotes of earlier compilations of the General Laws also provide under the section on limitation of actions, the period of limitations for slander actions. For example, in G.L.1938, ch. 510, § 1, we find, "Slander, 1 year"; in G.L.1923, ch. 334, § 1, "Slander, one year"; and in G.L.1909, ch. 284, § 1, "Slander, one year." In fact, even the 1857 "Revised Statutes" restricted "[a]ctions of slander" "for words spoken" to two years. Rev. Stat. 1857, ch. 177, § 1. Thus, as past generations of state lawmakers apparently have presumed, and as we suggested in *Mikaelian*, 501 A.2d at 723–24, the reference to "words spoken" in § 9–1–14(a) does not broaden the statute's application beyond slander but precisely limits it to *oral* rather than written defamation. Therefore, because § 9–1–14(a) applies only to actions for defamation by spoken word, it is inapplicable to the instant allegation of fraud.

■ At oral argument before this Court, counsel for plaintiff also argued in the alternative that an action for fraud in the inducement should be governed by the three-year period of limitations of § 9–1–14(b), which applies to actions for "injuries to the person." In *Commerce Oil Refining Corp. v. Miner*, 98 R.I. 14, 20–21, 199 A.2d 606, 610 (1964), this Court suggested that

"the phrase 'injuries to the person' as used in [§ 9–1–14(b) ] is to be construed comprehensively and as contemplating its application to actions involving injuries that are other than physical. Its purpose is to include within that period of limitation ac-

tions brought for injuries resulting from invasions of rights that inhere in man as a rational being, that is, rights to which one is entitled by reason of being a person in the eyes of the law * * * [as] distinguished from those which accrue to an individual by reason of some peculiar status or by virtue of an interest created by contract or property."

■ In this case, defendants' counterclaim asserted that plaintiff had fraudulently induced defendants to enter the Agreement by promising that "a substantial amount of business would be given to [defendants] in order to make [their newly acquired mattress business] solvent and profitable." Fraud in the inducement is defined as "[m]isrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken." Black's Law Dictionary 661 (6th ed.1990). The damages suffered by defendants, and thus their compulsory counterclaim for the fraud that gave rise to those damages, were inseverable from their contractual relationship with plaintiff. Under the analysis of *Commerce Oil Refining Corp.*, defendants' counterclaim is not an action for "injuries to the person." Hence, because the Legislature has not specified a period of limitations for actions for fraud in the inducement to a contract, it is our conclusion that the general ten-year period of § 9–1–13(a) applies to actions for fraud or deceit.

### Form for Special Verdict

■ The plaintiff next contended that the verdict form prepared by the trial justice was materially misleading in respect to the issues to be decided by the jury. Pursuant to Rule 49(a) of the Superior Court Rules of Civil Procedure, the trial justice gave the jurors a special verdict form that asked the following questions:

"1. Has Plaintiff, Bourdon's Inc., proven by a fair preponderance of the evidence that Defendants, Ecin Industries, Inc., Harvey Bigelow and Patricia MacMillen without justification breached their agree-

ment and guarantees to make payments for the sale of the assets from Bourdon's, Inc. to Ecin Industries, Inc.? * * *

"If your answer to question 1 is *No,* then go on to answer question 2. If your answer to question 1 is *Yes,* your deliberations will cease and you will return a verdict for Bourdon's on its claim and a verdict for Bourdon's on Ecin Industries, Inc., Harvey Bigelow and Patricia MacMillen's counterclaim.

"2. Have Defendants, Ecin Industries, Inc., Harvey Bigelow and Patricia MacMillen proven by clear and convincing evidence that Plaintiff, Bourdon's Inc., through its principal, John Bourdon, made material representations intending that Defendants, Ecin Industries, Inc., Harvey Bigelow and Patricia MacMillen rely upon them and they in fact did rely upon them? * * *

"3. What is the total amount of damages sustained by Defendants, Ecin Industries, Inc., Harvey Bigelow and Patricia MacMillen?"

The plaintiff argued that this verdict form was replete with errors including, inter alia, the fact that question No. 1 failed to limit the jury in its consideration of defendants' breach to "legally sufficient justification" rather than mere "justification" and misled the jury into believing that it would not be allowed to consider defendants' offsets if it found that defendants had wrongfully breached. The plaintiff charged question No. 2 with the most serious deficiency because it read "material representations" rather than the legally correct phrase "material *mis* representations." This typographical error, plaintiff asserted, seriously prejudiced its case because defendants were not held to their burden of proving both that plaintiff knew the representations it had made to defendants were false and that plaintiff had intentionally induced defendants to rely on those misrepresentations to their detriment.

We indicated in *H.J. Baker & Bro., Inc. v. Orgonics, Inc.,* 554 A.2d 196 (R.I.1989), that in order to preserve an objection to the form of special interrogatories under Super. R. Civ. P. 49(a), a party must either submit requested interrogatories to the court and have them denied or object to particular interrogatories before the jury retires to reach a verdict. *Id.* at 201 (citing *Stewart & Stevenson Services, Inc. v. Pickard,* 749 F.2d 635, 641 (11th Cir.1984)). The plaintiff acknowledged that it knew the trial justice would be presenting special interrogatories to the jury and that the trial justice and the parties' attorneys discussed the contents of the verdict form in chambers. Yet, plaintiff did not avail itself of the opportunity to submit requested interrogatories, nor did it object to those that the trial justice sent to the jury. Although plaintiff claimed that it had no opportunity to object to the verdict form, the record revealed that after charging the jury but before the form was sent out, the trial justice convened a sidebar conference and specifically asked the parties' lawyers if either had any objections. The plaintiff's counsel indicated that he had none other than his objection to the trial justice's refusal to charge the Statute of Frauds. A second opportunity to object to the verdict form on the record arose just shortly after this colloquy, when the trial justice instructed the lawyers for the parties to inspect the materials that would be sent to the jury room to ensure that only those exhibits marked "full" were included. The plaintiff's counsel did not object but, rather, expressed that plaintiff was "satisfied." Because plaintiff failed to comply with the Rule 49(a) requirements for preserving an objection to a special verdict form, we consider this issue waived on appeal.[1]

### Jury Instruction on Statute of Frauds

■ The plaintiff next argued that the trial justice committed reversible error in re-

---

1. We agree with plaintiff that the wording of the questions on the special verdict form was erroneous. We note, however, that our concern over potential injustice or error in the verdict is allayed because, in the accompanying charge to the jury, the trial justice painstakingly reviewed the legal definition and importance of "material

misrepresentation." In light of the attention given to this issue by the justice, it is unlikely that the jury misunderstood plaintiff to be liable for damages because of any truthful representations that Bourdon made to defendants. The trial justice also specifically and carefully reviewed

fusing to charge the jury on the Statute of Frauds, and that such a charge was necessary because defendants "contended that the [plaintiff] had made certain oral promises to them concerning referral of future business which the [defendants] testified was to take place over a five year period, and was not to be performed within one year."[2] Specifically, plaintiff maintained that "[t]he jury had an obligation to determine whether the alleged oral agreements [defendants] asserted as defenses to [plaintiff's] claim and as an independent *action in their counterclaim* were enforceable, in light of the statute of frauds."

Section 9-1-4 provides in pertinent part:

> "**Statute of Frauds.**—No action shall be brought:
>
> \* \* \*
>
> (5) Whereby to charge any person upon any agreement which is not to be performed within the space of one (1) year from the making thereof \* \* \*
>
> unless the promise or agreement upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him thereunto lawfully authorized."

It is well established that the purpose of the Statute of Frauds "is to guard against perjury by one claiming under an alleged agreement." *Smith v. Boyd*, 553 A.2d 131, 132 (R.I.1989) (citing *Peacock Realty Co. v. E. Thomas Crandall Farm, Inc.*, 108 R.I. 593, 601–02, 278 A.2d 405, 409–10 (1971)).

defendants' burden with respect to proving their counterclaim for fraud.

2. The trial justice refused to charge the jury in accordance with plaintiff's charge No. 9, which read:

> "**Need for a Written Contract.** In order for you to find that there was any agreement which existed between the Plaintiff and the Defendants with regard to purchasing of products by the Bourdon's, Inc. [*sic*] from the defendants for a period which was to exceed one year, there must be some written note or memorandum of that agreement signed by Bourdon's, Inc. to that effect. In addition, to prove that there was such a long term agreement between the parties, the signed memo-

The special verdict form furnished to the jury by the trial justice revealed that only three questions were to be decided. *See ante.* The defendants' affirmative defense of breach of contract was not placed before the jury.[3] Properly construed, the question before this Court is whether the Statute of Frauds precluded defendants from offering proof of alleged oral representations by plaintiff to substantiate their counterclaim for fraud,[4] or whether the trial justice was correct in his reasoning that the jury should *not* be charged on the Statute of Frauds because the charge "*[wasn't] applicable* under the circumstances and the evidence." (Emphasis added.)

The question of whether the Statute of Frauds precludes an individual from offering proof of an oral promise or representation to substantiate a claim of fraud in situations like the one before us appears to have been last addressed in *Barry v. Wixon*, 22 R.I. 16, 46 A. 42 (1900) (per curiam). The defendant in that case allegedly made oral misrepresentations regarding the mortgage on a piece of real estate. The plaintiffs purchased the property in reliance thereon. The Court held that the plaintiffs' subsequent action for deceit was precluded by the Statute of Frauds, explaining that

> "[i]f [the alleged oral misrepresentation] was made, and was relied on by the plaintiffs as a material inducement to the purchase of the land, they should have had it put into writing, and made a part of the contract of purchase of the land from the defendant, as required by the statute of frauds." *Id.* at 17, 46 A. at 42

randum must contain all of the material substantive terms of the contract, so that it is not necessary to resort to oral testimony to support one or more of such terms and to make it complete and definite."

3. In their respective briefs to this Court, both plaintiff and defendants argued the jury charge issue as though defendants' breach-of-contract claim had been placed before the jury. Neither party addressed the counterclaim of fraud in its discussion of the Statute of Frauds.

4. The defendants also raised the affirmative defense of fraud and/or deceit. We confine our discussion and analysis to the counterclaim for fraud because the record reveals that the trial

*Barry,* however, has never been cited in any subsequent case by this Court.[5] Decades after the *Barry* decision, we examined the issue of false and fraudulent misrepresentation in *Berberian v. Martin,* 100 R.I. 227, 214 A.2d 189 (1965), in which the complainant alleged that the respondent had fraudulently induced him to purchase the respondent's refreshment stand business by making misrepresentations about the amount of business and gross income generated by the business. Although it denied the complainant's contentions of error in the trial court's evidentiary rulings, the Court observed that, "[w]here fraud is alleged, the court has a wide discretion with respect to the admission of evidence either to prove or disprove that allegation." *Id.* at 228, 214 A.2d at 190 (citing *International Shoe Co. v. Berick,* 55 R.I. 333, 335, 181 A. 297, 298 (1935)).

The First Circuit Court of Appeals has, however, squarely addressed the question of whether the Statute of Frauds prohibits evidence of an oral promise or representation to substantiate a claim for misrepresentation, fraud, and/or deceit in a context analogous to the one presented in the instant case. In *LaBarre v. Shepard,* 84 F.3d 496 (1st Cir. 1996), the defendants had instituted foreclosure proceedings against the plaintiffs following the plaintiffs' default on their mortgage. *Id.* at 497. According to the plaintiffs, prior to foreclosure the parties' attorneys had orally agreed that the plaintiffs would deliver a deed in lieu of foreclosure, and in return defendants would credit $150,000 toward any mortgage deficiencies. The defendants denied that any such agreement was reached. *Id.* at 498. When the defendants refused to honor this alleged agreement and foreclosed on the property, the plaintiffs brought a diversity action in federal court. The plaintiffs' complaint contained five counts: (1) unfair and improper foreclosure; (2) breach of contract; (3) intentional misrepresentation;

(4) fraud; and (5) unfair trade practices under New Hampshire law. *Id.* The defendants moved in limine to exclude all evidence of the alleged oral agreement to accept a deed in lieu of foreclosure, relying on New Hampshire's Statute of Frauds.[6] The trial court denied the motion, ruling that, under state law, the Statute of Frauds did not apply to oral settlement agreements between attorneys. The jury, answering special interrogatories, subsequently returned a verdict for the plaintiffs on all five counts. The defendants argued on appeal that the trial court erred, inter alia, in allowing evidence of the alleged oral agreement. *Id.* at 499.

The First Circuit Court of Appeals affirmed the trial court's evidentiary ruling, based not on an exception to the Statute of Frauds, but, rather, on the *inapplicability* of the Statute of Frauds. The court, noting that the parties to the action had, as in the instant case, misconstrued the issue, reasoned:

"[T]he parties miss the real issue and misunderstand the operation of the Statutes of Frauds.

"There is no need here to decide the existence, scope, or applicability of the asserted common-law exceptions to the Statute of Frauds (the so-called 'oral settlement agreement between attorneys' exception and the part-performance exception). We hold instead that, under New Hampshire law, the Statute of Frauds is only a bar to the enforcement of certain oral contracts; it is not a rule of evidence. *Evidence of the oral agreement in this case was relevant to the counts alleging* improper foreclosure, *misrepresentation, fraud,* and unfair trade practice * * *.

* * *

"Because *the evidence of the alleged oral agreement was admissible for pur-*

---

justice placed only the counterclaim before the jury.

**5.** Our research revealed that *Barry v. Wixon,* 22 R.I. 16, 46 A. 42 (1900), has been cited by only one court on one occasion. In *Alletson v. Powers,* 72 Vt. 417, 48 A. 647 (1900), the Supreme Court of Vermont cited *Barry* for a proposition not at issue in this case.

**6.** New Hampshire Rev.Stat.Ann. § 506:1 (1955) (1997 Replacement ed.) provides in pertinent part that "[n]o action shall be maintained upon a contract for the sale of land unless the agreement upon which it is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person authorized by him in writing."

poses other than enforcing that agreement, i.e., to prove the four non-contract counts, and because *the breach of contract count did not affect the judgment,* there is no reversible error * * * ." (Emphases added.) 84 F.3d at 500–01.

*See also Munson v. Raudonis,* 118 N.H. 474, 387 A.2d 1174, 1176–77 (1978) (holding that Statute of Frauds does not bar action in deceit to recover on oral promise, although it would bar action to enforce alleged contract); *Brown v. Founders Bank and Trust Co.,* 890 P.2d 855, 865 (Okla.1994) ("[a] statute of fraud does not abolish the common law remedy for fraud merely because the fraudulent misrepresentation is not in writing"); 37 C.J.S. *Frauds, Statute of* § 27 (1997) ("[t]he fact that false representations are made in connection with a contract which the general statute of frauds requires to be in writing does not render it necessary that such representations shall be in writing in order that they may sustain an action of deceit * * * *where plaintiff does not seek to enforce the contract or sue for a breach thereof*") (emphasis added); Restatement (Second) *Contracts* § 143 (1981) ("[t]he Statute of Frauds does not make an unenforceable contract inadmissible in evidence for any purpose other than its enforcement in violation of the Statute").

In the instant case, as noted *ante,* plaintiff disavowed making any oral representations; it was defendants' counterclaim for fraud in the inducement of the contract that was presented to the jury and answered by an interrogatory in the verdict form. The defendants' affirmative defense of breach of contract was never placed before the jury. Because proof of plaintiff's alleged oral representations was relevant to the counterclaim, we hold explicitly for the first time that § 9–1–4 is inapplicable to a claim of misrepresentation, fraud, and/or deceit, and thus overrule *Barry v. Wixon* to the extent that it holds to the contrary. It is our opinion that invoking the Statute of Frauds in cases like the one at bar would exploit the statute as an engine of fraud and would "sanction rather than * * * prevent an injustice," *Peacock Realty Co.,* 108 R.I. at 602, 278 A.2d at 410. Accordingly, we conclude that the trial justice's refusal to charge the jury on the Statute of Frauds was not error.

## Evidentiary Objections

The plaintiff's fifth claim of error was that the trial justice erred in admitting certain documents into evidence over its objections. Specifically, plaintiff maintained that the admission of defendants' version of the customer list was erroneous because defendants had failed to establish a proper foundation for the list. In addition, plaintiff argued that the admission of the BIS sales catalogues for 1994 and 1995 (defendants' exhibit Nos. B and C, respectively), and of an envelope with a distinctive ticking pattern on it (defendants' exhibit No. D), constituted error because the items were not relevant to the case and because an adequate foundation had not been laid for their admission.

Following an exchange between Bigelow and defendants' attorney regarding defendants' customer list, the list was admitted as a full exhibit, over plaintiff's objection that Bigelow "never said where it came from or who delivered—or who had given it to him." Although Bigelow admitted at trial that he was uncertain how he acquired defendants' version of the list, he was unequivocal in his assertion that the proffered list was identical in content to that which he had been shown prior to the closing. The record further suggested that Bigelow testified that defendants' proffered list was not the original list that he had been shown prior to the closing because it included asterisks; Bigelow never testified that the contents of the proffered list were different from those of the original.

The plaintiff also argued that the admission of the BIS sales catalogues for 1994 and 1995 constituted error because there had been no showing that BIS "is related to Mr. Bourdon or to this action." The trial justice explained, however, that the catalogues were admissible because Bigelow "testified that both of these catalogues were similar to [plaintiff's catalogues that] he reviewed prior to entering into the agreement with Mr. Bourdon."

Finally, plaintiff claimed error in the admission of an envelope with a distinctive tick-

ing pattern on it after Bigelow testified that the envelope was "[e]xactly the same" as the envelopes in which defendants would receive correspondence from plaintiff. The envelope's pattern apparently matched the pattern on an invoice that BIS sent to J & W. Although plaintiff objected to the admission of the envelope on the ground that Bigelow had testified that the envelope was of the kind received from "Mr. Bourdon," and, as such, was not relevant to the instant action since Bourdon was not a named party, the transcript revealed that Bigelow responded in the affirmative when asked, "Is that the type of envelope you'd receive from *Bourdon's* over this period of time?" (Emphasis added.)

■ It is well established that "the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." *Soares v. Nationwide Mutual Fire Insurance Co.*, 692 A.2d 701, 701–02 (R.I.1997) (mem.) (citing *Cuddy v. Schiavonne*, 568 A.2d 1387, 1389 (R.I.1990)). We have held that this standard is applicable to a trial justice's determinations with respect to both the relevancy of proffered evidence and the adequacy of the foundation laid for its admission. *See, e.g., Montecalvo v. Mandarelli*, 682 A.2d 918, 927 (R.I.1996) (relevancy); *Puccio v. Diamond Hill Ski Area, Inc.*, 120 R.I. 28, 38, 385 A.2d 650, 656 (1978) (foundation).

The record before us is devoid of any evidence of an abuse of discretion on the part of the trial justice in admitting defendants' proffered documents, albeit over plaintiff's objections. In the absence of such a showing, we conclude that no error occurred in their admission.

### Weight of the Evidence

The plaintiff's final argument on appeal was that the jury's verdict was against the fair preponderance of the evidence. The plaintiff essentially argued that (1) the jury could not have considered defendants' affirmative defense of breach of contract and counterclaim for fraud as offsets to the amount defendants owed on the Note had the

statute of limitations and the Statute of Frauds been applied to bar these claims or, in the alternative, (2) even if the affirmative defense and the counterclaim were considered, they could only be used to offset the amount owed on the Note, and not, as the jury had done, to assess additional damages. This claim was raised, and presumably addressed, at the July 5 hearing on plaintiff's motion for a new trial.

■ In *Morgera v. Hanover Insurance Co.*, 655 A.2d 698, 698 (R.I.1995) (mem.), this Court succinctly articulated the role of the trial justice in ruling upon a motion for a new trial based on the alleged inadequacy of evidence:

> "[T]he trial justice must consider, in the exercise of his independent judgment, all the material evidence in the case, in the light of his charge to the jury and pass on its weight and the credibility of the witnesses, determine what evidence is believable, and, decide whether the verdict rendered by the jury responds to the evidence presented and does justice between the parties. In ruling on a motion for a new trial if his or her independent judgment persuades the trial justice that the verdict is wrong because it fails to respond truly to the merits and to administer substantial justice between the parties or is against the fair preponderance of the evidence, he should set aside the verdict and order a new trial. *Cartier v. State*, 420 A.2d 843 (R.I.1980)."

Moreover, "the trial justice need not engage in an exhaustive review and analysis of all of the evidence and testimony presented at trial * * * [but] need only *make reference to such facts* disclosed by the testimony *as have motivated his or her conclusion.*" *Kwarciak v. Star Market*, 506 A.2d 545, 547 (R.I.1986) (citing *Zarrella v. Robinson*, 460 A.2d 415 (R.I.1983); *Yammerino v. Cranston Tennis Club, Inc.*, 416 A.2d 698 (R.I.1980)). (Emphases added.)

■ Our review of the record reveals that the plaintiff has failed to provide this Court with a transcript of the July 5 hearing. Rule 10(b)(1) of the Supreme Court Rules of Appellate Procedure requires an appellant to

order "a transcript of such parts of the proceedings not already on file as the appellant deems necessary for inclusion in the record." The plaintiff's failure to order a transcript of the hearing on the motion for a new trial precludes meaningful review by this Court of the factors that prompted the denial of the plaintiff's motion. *State v. Mattera*, 671 A.2d 1227, 1229 (R.I.1996) (per curiam) (citing *Chariho Regional High School District v. Town Treasurer of Hopkinton*, 109 R.I. 30, 45, 280 A.2d 312, 320 (1971)). In such circumstances, we have "no choice but to uphold the trial justice's findings." *In re Kimberly and James*, 583 A.2d 877, 879 (R.I.1990). Therefore, the plaintiff's appeal on this issue must fail.

In summary, for the foregoing reasons, we deny and dismiss the plaintiff's appeal and affirm the judgment of the Superior Court, to which we return the papers in this case.