HARODITE INDUSTRIES, INC.

v.

WARREN ELECTRIC CORPORATION
et al.

No. 2009–222–M.P.

Supreme Court of Rhode Island.

July 6, 2011.

Thomas W. Lyons III, Esq., Providence, for Plaintiff.

Christine K. Bush, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON for the Court.

This case came before the Supreme Court as a result of our having granted a petition for writ of certiorari filed by Harodite Industries, Inc., whereby it sought review of an order of the Superior Court denying the petitioner's motion to amend its complaint. Specifically, the petitioner has asked this Court to determine whether or not the hearing justice's denial of that motion was an abuse of discretion. Further, in accordance with the order of this Court granting the petition, the parties have also addressed the issue (which was previously addressed by the Superior Court) of whether a Rhode Island or a Massachusetts statute of limitations should apply to the claims asserted by the petitioner in its proposed amended complaint.

For the reasons set forth in this opinion, we affirm the ruling of the Superior Court with respect to the motion to amend, and we are in agreement with its determination concerning the choice of law issue.

### I

### Facts and Travel

The first issue before us is the correctness *vel non* of the hearing justice's denial of plaintiff's [1] motion to amend its original complaint. The plaintiff's basic contention

---

1. Since the issues that we are called upon to address in this opinion require extensive examination of what transpired during pretrial discovery, we shall hereinafter on occasion refer to petitioner and respondent as plaintiff and defendant, respectively.

is that the denial of that motion was an abuse of discretion because, when it filed the motion, plaintiff had only very recently acquired (from defendant pursuant to the discovery process) the information upon which its proposed amended complaint would in large measure be predicated.

The second issue before us (the choice of law issue) also must be understood in light of the specific factual and procedural context within which it arose.

Accordingly, we shall summarize, as briefly as is practicable, the travel of the case and the relevant discovery exchanges of the parties to the extent necessary to provide context for the issues before us.

## A

### The Original Complaint

On April 29, 2005, plaintiff, Harodite Industries, Inc., filed a complaint in the Superior Court for Providence County, with respect to an incident that occurred at Harodite's facility in Taunton, Massachusetts in May of 2002. The complaint named numerous defendants, including defendant Warren Electric Corporation. (The other defendants are no longer parties to the underlying litigation.)

In its complaint, Harodite alleged that "[o]n or about August 13, 2001, Warren Electric sold an oil pre-heater to Harodite * * *."[2] Harodite also alleged that another company had "sold a gasket to War-

ren Electric, which gasket Warren Electric installed in the oil pre-heater it sold to Harodite." Harodite's complaint then described the incident giving rise to the civil action as follows:

"[O]n May 3–4, 2002, the gasket failed under normal operating conditions causing over 3300 gallons of no. 6 heating oil to spray out of Harodite's heating system into its boiler room. The oil then ran into Harodite's basement and maintenance shop and from the maintenance shop into the adjacent Three Mile River. This caused significant property and environmental damage and forced Harodite to incur substantial cleanup costs, property depreciation and lost profits."

Harodite sought to recover "for damages to its property, for the costs of environmental cleanup[,] and for lost profits, all directly and proximately resulting from the failure of the gasket in the oil pre-heater, in an amount exceeding five hundred thousand dollars ($500,000.00)." Harodite did not seek to recover for any damages arising from personal injury.

Harodite's original complaint contained the following counts with respect to Warren Electric: (1) breach of the implied warranty of merchantability; (2) breach of the implied warranty of fitness for a particular purpose; (3) breach of contract; (4) negligence; (5) defect in manufacture; (6) defect in design; and (7) declaratory judgment.[3] Significantly, with respect to

2. In its brief to this Court, Warren Electric provides the following description of an oil pre-heater:

"[A] resistance heater converts electrical energy into heat. The heaters generally consist of rigid U-shaped resistance loops (known as elements) secured by brazing to a flange. Where such heaters are used to preheat oil, as in this case, the heater is inserted into a second piece of equipment, usually called a casing, to contain the oil while it passes by and through the heated

elements before exiting the encasement and flowing to the oil burner and the boiler or back to the storage tanks. * * * In that configuration, the flange of the oil preheater and the flange of the casing are secured together using four bolts, with a gasket between the flanges."

3. In count seven of its original complaint, Harodite sought a declaratory judgment to the effect that "the terms and conditions of Warren Electric's invoice purporting to exclude warranties and limit damages are not

counts four, five, and six, the thrust of the allegations in Harodite's original complaint was that "the gasket used in the assembly of the pre-heater was *too large for the space* in which it was placed." (Emphasis added.) [4]

## B

### The Discovery Process

### 1. The Initial Discovery

#### a. Harodite's Interrogatory Numbers 25 and 26

In July of 2005, plaintiff and defendant propounded interrogatories and requests for production of documents upon each other. On August 22, 2005, defendant Warren Electric filed its first set of answers to plaintiff's interrogatories. Of significance to the instant appeal are the following interrogatories propounded by Harodite and Warren Electric's responses:

*"INTERROGATORY NO. 25:*

State what you contend caused the failure of the Warren Electric oil pre-heater at Harodite on May 3–4, 2002.

*"RESPONSE TO INTERROGATORY NO. 25:*

At this time, Warren has not made any contentions concerning the cause of this spill, as investigation is incomplete. Among other things, no information or site visit has been allowed to determine the workings of the entire system, the control system, maintenance or the relief valve.

*"INTERROGATORY NO. 26:*

Set forth the facts that support the contention you stated in response to the previous interrogatory including the

names and last known addresses of the persons having knowledge of those facts.

*"RESPONSE TO INTERROGATORY NO. 26:*

Inapplicable at this time."

#### b. Warren Electric's Interrogatory Numbers 12 and 13

Between October of 2005 and May of 2006, Warren Electric and Harodite engaged in several rounds of discovery (and discovery-related disputes) with respect to Harodite's answers to Warren Electric's interrogatories and its answer to interrogatory No. 12 in particular; that interrogatory had asked Harodite to explain the maintenance and service procedures that were in place in 2001 and 2002 with respect to the pre-heater, gasket, pressure relief valves, system controls, electrical connections, and boiler. Harodite stated in its first response (dated January 6, 2006) that "[t]here was no maintenance performed on the pre-heater." Harodite essentially adhered to that position in its first more responsive answer (dated March 8, 2006). However, in its second more responsive answer (dated May 3, 2006), Harodite stated in pertinent part as follows:

"SECOND MORE RESPONSIVE ANSWER:

The maintenance consisted of switching the strainers every other week to filter the oil. The gauges would be monitored on a daily basis. These two tasks were performed as a matter of course, they were not reduced to writing. Every year the controls would be checked by Warren Professional Controls. The safety valves were tested by Transcat after the incident. Moreover, every

---

sufficiently conspicuous to be enforceable and are otherwise unconscionable * * *."

4. The original complaint that was filed on April 29, 2005 was not the subject of any motion to amend until April 23, 2009.

year the boiler would be inspected by a Commonwealth of Massachusetts boiler inspector. If .any parts failed, they would be immediately replaced. Harodite's employees monitor gauges and make visual inspections in a constant basis and do maintenance as required. There is no other written or recorded inspection or maintenance schedule."

Also of significance to the instant appeal is Harodite's answer (dated January 6, 2006) to Warren Electric's interrogatory No. 13. Warren Electric's interrogatory and Harodite's answer read as follows:

*"INTERROGATORY NO. 13:*

Identify any problems or issues experienced with the Pre–Heater, the Casing or the Gasket prior to May 2002.

"ANSWER: The pre-heater was purchased on August 31, 2001. The pre-heater was installed on September 20, 2001. The pre-heater failed sometime between May 3, 2002 at 3:00 p.m. and May 4, 2002. *There were no problems or issues prior to that time."* (Emphasis added.)

Harodite never supplemented or amended its answer to this particular interrogatory.

### 2. A New Theory

Quite significantly, as the discovery process continued, on November 17, 2007, Harodite provided supplemental answers to interrogatories that had been propounded by Acadia Elastomers Corp.—a defendant named in Harodite's original complaint, but not a party to these appellate proceedings. (Harodite's certificate of service that accompanied those supplemental answers indicates that a copy thereof was sent to counsel for Warren Electric.) Among those supplemental answers was Harodite's supplemental answer to Acadia Elastomers' interrogatory No. 15 ("State whether you have consulted, engaged or otherwise obtained the assistance of any expert, with respect to any of the issues in this case * * *."). In response to that interrogatory, Harodite identified Dr. Ali M. Sadegh and described the subject matter about which Dr. Sadegh would testify as follows:

"The subject matter on which Dr. Sadegh will testify will concern, inter alia, the fact that *a gasket can be damaged by the bolts if it is not centered properly when installed.* This can happen if a pre-heater is assembled with the flange in the vertical position as the gasket may slip down before the bolts are tightened. Also, a flange that has a raised surface on one side that might also contribute to the gasket being displaced from the center. If the bolts are tightened too much in the assembly process the gasket may get crushed. Moreover, if the bolts are not tightened evenly the flange may expand and contract unevenly as it heats and cools during the circulation process. There may be a leakage or greater pressure at the less tight points. This opinion is based upon a review of the case pleadings and materials and an inspection of the accident site and the subject pre-heater." (Emphasis added.) [5]

5. It will be recalled that, in its original complaint, Harodite had alleged that the gasket in the pre-heater was *too large.* In stark contrast, the supplemental answer quoted in the text makes reference for the first time to what can happen when a gasket is *not centered properly.*

It is important to bear in mind that it was *in November of 2007* that Harodite described the anticipated testimony of its expert in the supplemental answer quoted in the text. Yet, it was *not until April of 2009* (when trial was imminent) that it moved to amend its complaint so as to include an allegation about the improper centering of the gasket.

### 3. Discovery Concerning RALCO Electric, Inc.

On September 24, 2008, Harodite produced certain documents in response to a Warren Electric Request for Production of Documents that had been propounded on July 19, 2005. Of particular significance to the instant appeal, the documents produced by Harodite included a copy of a three-page document, which included an invoice and work order from a company named RALCO Electric, Inc.[6]

On September 30, 2008, defendant Warren Electric deposed Chad Rosen, an employee of Harodite. Mr. Rosen testified as to his belief that Harodite's plant electrician had asked RALCO to perform work on the heater. During Mr. Rosen's deposition, the above-referenced three-page document was marked as an exhibit and was described in pertinent part as follows:

"Three-page document containing copy of Check No. 32381 payable to Ralco Electric Inc. dated 5/13/02, Invoice from Ralco to Harodite dated 5/13/02, and Work Order from Ralco Electric, Inc. dated *4/30/02* * * *." (Emphasis added.)[7]

Mr. Rosen agreed that the work order bore his signature and that he had thereby acknowledged that the referenced work had been completed. He further agreed (in response to a question posed to him at the deposition) that the work in question was the addition of "a remote oil temperature thermostat which is wired to shut heat off in both normal and constant modes."

Mr. Rosen was then asked the following question at the deposition: "Do you know why Ralco was adding a remote oil temperature [thermostat] to the Warren Electric preheater in April of 2002?" He stated that he thought that it was being added "as a precautionary measure because [of] * * * trouble with the thermostat and they didn't want to cause any overheating."[8] According to his deposition testimony, it was Mr. Rosen's understanding that the remote thermostat would perform the following function: "If it sensed [that] the oil temperature coming out of the heater was too hot and the thermostat stayed on on the Warren heater, it would automatically shut the system down."

### 4. Harodite's Supplemental Answer of March 24, 2009

On March 24, 2009, Harodite supplemented its answer to Warren Electric's interrogatory No. 3 (first propounded on July 19, 2005), which interrogatory had sought information about Harodite's expert witnesses. Harodite's supplemental answer reads as follows:

"Plaintiff hereby incorporates by reference Plaintiffs Supplemental Answer to Defendant Acadia Elastomer[s'] * * * Expert Interrogatories certified to the parties on November 19, 2007, which answer identified Dr. Ali Sadegh as Plaintiff's expert witness. Plaintiff also

**6.** On its website, RALCO Electric, Inc. describes itself as a "full-service electrical company * * *." Ralco Electric—About Us, http://ralcoelectric.com/about-us/ (last visited July 5, 2011).

**7.** It will be recalled that the oil spill that eventuated in the instant litigation occurred on May 3–4, 2002. That date is very close in time to the date on the RALCO Electric work order that is referred to in the text.

**8.** It will also be recalled that, in its answer to Warren Electric's interrogatory No. 13 (dated January 6, 2006), Harodite had stated that "there were no problems or issues" with the pre-heater prior to the oil spill. It will further be recalled that Harodite's various answers to Warren Electric's interrogatory No. 12 make no reference to the work performed by RALCO that is described in the text.

incorporates by reference the report of Dr. Ali Sadegh dated October 6, 2008 provided to Warren Electric on or about October 10, 2008."

### 5. Warren Electric's Supplemental Answer of March 26, 2009

On March 26, 2009, defendant Warren Electric supplemented its answers to Harodite's interrogatories. Significantly, Warren Electric supplemented its answers to interrogatory No. 25 (which interrogatory asked Warren Electric to state its contention as to what caused the failure of the pre-heater) and No. 26 (which interrogatory asked Warren Electric to set forth the facts that supported its contention as set forth in interrogatory No. 25). Warren Electric's supplemental answers to those two interrogatories read as follows:

"*SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 25:*

It appears the oil spill was caused by misuse of the Warren Electric oil pre-heater and casing by Harodite.
" * * *

"*SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 26:*

In addition to Harodite employees, Roberta Benjamin and William Smith have knowledge of the facts supporting the contention identified in response to Interrogatory No. 25. Based on the deposition testimony of current and/or former Harodite employees, in addition to what was observed during the November 2002 inspection of the pre-heater when it was disassembled, it appears that Harodite severely overheated its oil

system and wired around the Warren Electric thermostat on the pre-heater. The electrical tests done at the November 2002 inspection showed that the Warren Electric switch was off. In fact, the switch had been so severely overheated and damaged, it was permanently off. The Warren Electric heater would not have heated the oil because it was not operable in this condition if wired properly."

### 6. Harodite's Deposition of Roberta Benjamin and William Smith

On April 20, 2009, Harodite deposed Roberta Benjamin (the president of Warren Electric) and William Smith (an employee of Warren Electric)—Warren Electric had identified those two persons as having knowledge of the facts supporting its contentions as set forth in its supplemental answers to interrogatories Nos. 25 and 26.

William Smith testified at his deposition about conversations that he had had with other Warren Electric employees while driving back from an inspection of the Harodite pre-heater, which inspection occurred at some point after the May 2002 incident. He stated that there was a "lot of conversation about how hot it had been, and how the unit had been damaged." Mr. Smith added that he had "surmised something" with respect to why the unit had been so hot. It was Mr. Smith's deposition testimony that he had said to his colleagues: "The switch was open, and I assumed that somebody else had bypassed the controls on this heater, preheater, casing combination." [9] Mr. Smith explained

---

**9.** We are aware of the highly technical and perhaps confusing nature of the deposition testimony about the state of the pre-heater at the time of the inspection and about the significance of the switch being "open" or "off" (as indicated, *supra*, in Warren Electric's supplemental answers to Harodite's interrogatory

No. 26). We found Warren Electric's brief to be helpful on this point:

"Essentially, once the oil reaches an excessive temperature, part of the thermostat diostat 'puffs' so the preheater cannot turn on again, and the switch is permanently in the open position; *the preheater can only*

why he thought that someone might have bypassed the controls as follows: "The switch was open, which means it should have been closed. It should have been closed at room temperature." As questioning of Mr. Smith by Harodite's counsel continued, the following two exchanges occurred:

"Q. Do you know whether there has ever been any warning or instruction to a customer that if they wire around this particular thermostat * * * they may cause damage to the preheater?

A. Specifically, no.

" * * * *

"Q. Just so we're clear, there's no device in the preheater which stops it from heating fuel at higher than 225 other than this thermostat?"

[COUNSEL FOR WARREN ELECTRIC]: Objection.

A. No." [10,11]

During Roberta Benjamin's deposition, she was also asked about the post-spill inspection and, more specifically, whether testing had "indicated anything unusual." Ms. Benjamin responded as follows:

"The thermostat switch showed that it was open, which means it was not calling

---

*operate when its switch is open if the user wired around the thermostat."* (Emphasis added.)
Warren Electric's brief to this Court describes a diostat as a device "which senses the temperature of the oil through a hole in the flange * * *."

**10.** Mr. Smith had previously testified during the deposition that, in the instructions that accompanied the pre-heater, 225 degrees Fahrenheit was indicated as being the maximum temperature at which it was safe to operate the pre-heater.

**11.** With respect to Harodite's eventual motion to amend its complaint, our review of the record indicates to us that the two exchanges quoted in the text served as the principal

---

for heat, and the diastat, again, that device I told you that goes down into the oil, it has a little tube on the end of it, it's filled with fluid, the fluid is designed to increase in volume as it gets hotter, and when it comes up to a certain temperature, it moves that oil up with a pin that turns our switch off. If it gets too hot, i.e., over 250 degrees, that fluid goes up into the diastat and puffs the wafer, shutting our switch off, that's when you need to replace your thermostat. This heater had a puffed wafer."

According to Ms. Benjamin, a "puffed wafer" is an indication that "the temperature that that diastat felt was more than 250 degrees."

## C

### Harodite's Motion to Amend Its Complaint

On April 23, 2009, plaintiff Harodite filed a motion to amend its complaint, stating that it was moving "pursuant to the Rules 15(a) and (b) of the Superior Court Rules of Civil Procedure." [12] In support of its motion, Harodite stated that the proposed amendment was "based on the April 20, 2009 deposition testimony of defen-

---

basis for Harodite's new allegation concerning the purported lack of a fail-safe system and its entirely new failure-to-warn count.

**12.** Rule 15(a) of the Superior Court Rules of Civil Procedure is quoted in pertinent part in section "III A" of this opinion, *infra.*

Rule 15(b) provides in pertinent part as follows:
"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time * * *."

dant's employees Roberta Benjamin and William Smith."

Harodite's proposed amended complaint set forth three changes that are of significance to the instant appeal. First, the proposed amended complaint set forth factual allegations that were in addition to those already set forth in count four (negligence) and count five (defect in manufacture) of the original complaint. Harodite continued to allege that the gasket was *too large* for the space in which it was placed, while adding to those counts a new allegation—*viz.*, that the flange gasket was *not centered* when it was installed. Second, with respect to count six (defect in design), Harodite continued to maintain that the design was defective because the gasket was too large, and it then added an entirely new allegation—*viz.*, that "the pre-heater failed to have a 'fail-safe' system to prevent it from overheating." Third, Harodite sought to add an entirely new count, entitled "Failure to Warn," alleging that "[d]efendant failed to warn plaintiff of the foreseeable risks of the use of its product and failed to provide adequate instructions for the use of its product."

On May 1, 2009, defendant Warren Electric filed an objection to Harodite's motion to amend its complaint. In its memorandum in support of that objection, Warren Electric asserted that Harodite's delay in amending its complaint caused the amendment to be both futile and unfairly prejudicial. Warren Electric summarized its objection as follows:

"The proposed amendment—brought seven years after the product arrived at Harodite's facility, seven years after the May 4, 2002 oil spill at Harodite's Taunton, Massachusetts facilities, seven years after an inspection at Harodite's insurer's laboratory, four years after the lawsuit was filed, and mere days before the scheduled trial date—is futile and, additionally, unfairly prejudices Warren Electric." [13]

Warren Electric contended that Rule 15(b) (dealing with issues that "are tried by express or implied consent of the parties") was not applicable to and did not support plaintiff's motion. Warren Electric further argued that the motion was futile because the proposed amendments would be barred by the applicable statute of limitations; it contended that Massachusetts law would govern and that plaintiff's claims would therefore be subject to the Commonwealth's three-year or four-year statute of limitations,[14] as opposed to Rhode Island's ten-year statute of limitations.

With respect to its contention that the proposed amendments would unfairly prejudice it, Warren Electric advanced a number of arguments. First, Warren Electric contended that defending against the new allegations set forth in the proposed amended complaint would be substantially burdensome. Warren Electric stated that it had been prepared to defend the case

---

**13.** With respect to the date of trial, Warren Electric stated in its May 1, 2009 memorandum to the Superior Court that "[a] trial calendar call was scheduled for April 24, 2009 and trial was scheduled for April 27, 2009." However, Warren Electric further noted that, due to the pendency of plaintiff's motion to amend, there had been a new trial calendar call scheduled for May 8, 2009. Harodite has not contested the accuracy of these representations.

For the sake of accuracy, it should be noted that the parties are in agreement that at no point had a *date certain* for trial been set.

**14.** As we explain in footnote 19, *infra*, we need not and do not resolve the issue of which particular Massachusetts statute of limitations would apply to the claims set forth in Harodite's proposed amended complaint.

based upon Harodite's allegation that the gasket was *too large*—whereas it was not prepared so close to trial to defend a case that contained newly articulated allegations relating to (1) the *alignment* of the gasket, (2) the lack of a "fail safe" system, and (3) the failure to warn. Warren Electric stated that, in view of the newness of these proposed further allegations, it would need to conduct discovery with respect to same and would potentially need to engage additional experts to address the newly minted allegations.

Warren Electric also contended that Harodite could have moved to amend earlier because "Harodite had access to all [the] information necessary to make these claims when it filed its original Complaint." More specifically, Warren Electric argued that Harodite knew "what warnings and instructions Warren Electric provided when it received the oil heater in August of 2001;" it also argued that Harodite knew "prior to the oil spill that its employees wired around the preheater's circuitry * * *." Warren Electric also contended that "[t]he alleged nonexistence of any 'fail-safe' system was known to Harodite [from the time that] it received the oil heater in August of 2001." Finally, with respect to Harodite's new allegation that the gasket was *not centered* at the time of installation, it was Warren Electric's contention that information regarding that allegation would have been available to Harodite when the pre-heater was separated from the casing at the inspection in 2002.

### D

### The Hearing on Harodite's Motion to Amend

On May 6, 2009, a hearing on Harodite's motion to amend was held in the Superior Court. As an initial matter, the hearing justice specifically declined to address the futility argument raised by Warren Electric in its objection to the motion to amend; she observed that, due to the fact that neither party had filed a motion seeking to have the court determine whether a Massachusetts or a Rhode Island statute of limitations would be applicable, she was not going to engage in such an analysis and was "not going to apply the doctrine of futility on the basis of the statute of limitations."

In assessing Harodite's motion to amend, the hearing justice expressly noted that the proposed amendments significantly changed the nature of the case; she observed in pertinent part as follows:

> "*[T]his completely changes the nature of the case* because you've been proceeding along since 2005 on the theory that it was the size of the gasket that caused the failure of the preheater. Now you're going to have to look at the preheater as a whole, consider the state-of-the-art in preheaters at the time this was designed, at the time it was built. You're going to have to do discovery on what it would have taken—what the best fail safe would have been, what it would have taken to engineer a modification, whether that was cost effective. This is completely open, [a] new field. And then when you get to this question of the warning, same thing." (Emphasis added.)

In response, Harodite argued that the "warning argument arises as a result of the defense that was put forth in the supplemental answers to interrogatories that were served on March 26th of this year [*i.e.,* 2009]."[15] Accordingly, in Harodite's

---

15. It will be recalled that the "defense" to which Harodite referred was set forth in Warren Electric's supplemental responses to Harodite's interrogatories Nos. 25 and 26, in which Warren Electric stated that "the oil spill was caused by misuse of the * * * pre-

view, its new failure-to-warn allegation was "based on that defense." Harodite's contention was that, if Warren Electric was "telling [Harodite] that [its] product [could] overheat to such an extent that it can cause its own gasket to fail," then it followed that Warren Electric "should have provided a warning * * *."

In the end, the hearing justice denied Harodite's motion to amend. She predicated her ruling on (1) the extent to which the proposed amendments altered the nature of the case and (2) the case's proximity to trial.[16] In concluding her ruling, the hearing justice stated in pertinent part as follows:

"[I]f you think you have claims * * *, [then file] * * * an additional complaint. But, I'm not going to derail this trial date and send the case back to ground zero. * * * [S]ince you're making new factual allegations, they're entitled to propound all new interrogatories and to get new reports and get new expert disclosure. They're not required to take a look at the old discovery and try to piece together how that might apply to these new contentions. I can't do it, and I wouldn't do it even if this thing was maybe three years down the road."

On May 22, 2009, an order entered denying plaintiff's motion to amend its complaint.

---

heater and casing by Harodite" and more specifically, that "Harodite severely overheated its oil system and wired around the Warren Electric thermostat on the pre-heater."

**16.** *See* footnote 13, *supra*.

**17.** Rule 44.1 of the Superior Court Rules of Civil Procedure provides in pertinent part as follows:

"A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. * * * The

## E

### Harodite's Motion for Stay and the Requests for Determination of Applicable Law

On May 6, 2009, the same day as the just-described hearing, Harodite filed a motion in the Superior Court for a stay pending a ruling on the petition for writ of certiorari that it intended to file with this Court.

On May 8, 2009, defendant Warren Electric objected to Harodite's motion for a stay. On May 15, 2009, it supported that objection with a memorandum of law which (1) set forth its grounds for objecting to a stay and (2) contained a "Request for Determination of Applicable Law Pursuant to R.I.Super. Ct. R. Civ. P. 44.1."[17] With respect to the latter issue, Warren Electric argued that "Massachusetts bears the most significant relationship to the event and the parties;" and it contended that, for that reason, the court should apply a Massachusetts statute of limitations.

Harodite filed its own memorandum of law on May 15, 2009, urging the court to grant its motion for a stay. It also argued that Rhode Island law should be determinative with respect to the statute of limitations issue—either as the result of conducting an interest-weighing analysis or because "most jurisdictions treat statutes

---

court's determination shall be treated as a ruling on a question of law."

With respect to the applicability of Rule 44.1 to issues concerning the law of another state (as contrasted with another country), this Court has expressly stated that, "[a]lthough the language of the rule itself speaks to law of a foreign country, the committee notes to that rule make it clear that the intention was to require notice in any case involving law of a foreign country *or state* * * *." *Rocchio v. Moretti*, 694 A.2d 704, 706 n. 2 (R.I.1997) (emphasis added); *see* Committee Notes to Rule 44.1.

of limitations as 'procedural' law and apply their own statutes to all common law claims in their courts * * *." In the alternative, Harodite argued that, even if the court were to find that Massachusetts law should apply, the Rhode Island statute of limitations would in the end be applicable as a result of the doctrine of *renvoi*.[18]

On July 9, 2009, a hearing was held in the Superior Court. The hearing justice first addressed the choice of law issue— that is, whether a Rhode Island or a Massachusetts statute of limitations should apply.[19] She noted at the outset that "Rhode Island has adopted an interest-weighing test to determine which law to apply * * *;" she added that, in light of that principle, the court "must determine which state bears the most significant relationship to the event and [to] the parties."

### 1. The Tort Factors

As she began her choice of law analysis, the hearing justice set forth in the following language the four factors that a court considers in conducting a choice of law analysis in an action sounding in tort:

"(1) The place where the injury occurred, (2) the place where the conduct causing the injury occurred, * * * (3) the domicile, residence, nationality, place of corporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered."

### 2. The Policy Considerations

The hearing justice then listed certain additional considerations that "must be weighed in determining which law applies:"

"(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." [20]

### 3. The Application of the Tort Factors

The hearing justice then proceeded to apply the above-listed "tort factors" to the instant case. It was her estimation that those factors "seemed fairly evenly balanced." As for the first tort factor, she noted that it was undisputed that the property damage occurred in Massachusetts. With respect to the second tort factor (concerning which the parties were not in agreement), she ruled that the conduct causing the injury occurred in Rhode Island—in view of the fact that defendant Warren Electric designed and assembled the pre-heater and affixed warnings with respect to it in Rhode Island. In address-

---

**18.** A frequently cited legal dictionary defines *renvoi* in pertinent part as follows:

"The doctrine under which a court in resorting to foreign law adopts as well the foreign law's conflict-of-laws principles, which may in turn refer the court back to the law of the forum." Black's Law Dictionary 1412 (9th ed. 2009).

**19.** General Laws 1956 § 9–1–13 provides in pertinent part as follows:

"(a) Except as otherwise specially provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after."

We have referred to this particular provision as the "catchall ten-year statute of limitations

for civil actions." *Carney v. Kardinal Land, Inc.*, 813 A.2d 50, 52 (R.I.2003).

The parties dispute *which* Massachusetts statute of limitations would apply to the various counts in plaintiff's amended complaint if it were to be determined that we should look to Massachusetts law with respect to the limitations issue. In view of the fact that we uphold the hearing justice's determination that Rhode Island law governs (see *infra*), we need not seek to resolve that issue.

**20.** We shall refer to these additional considerations as "policy considerations" so as to avoid confusion with the "tort factors."

ing the third tort factor, the hearing justice noted the respective domicile of the parties: plaintiff Harodite is a Massachusetts corporation with its principal place of business in that Commonwealth, while defendant Warren Electric is a Rhode Island corporation with its principal place of business in this state. Significantly, with respect to the fourth tort factor (*viz.*, where the relationship between the parties is centered), the hearing justice found that the relationship between the parties is "more centered in Rhode Island." She explicated her findings with respect to this fourth tort factor as follows:

> "The Plaintiff turned to Rhode Island to obtain the product. The product was shipped from Rhode Island[,] and payment for it was sent to Rhode Island."

In concluding her analysis of the four tort factors, the hearing justice determined that "[e]ver so slightly, * * * the tort factors weigh[ed] in favor of applying Rhode Island law, including the statute of limitations."

### 4. The Application of the Policy Considerations

The hearing justice then turned to the five additional policy considerations that she had outlined at the beginning of her choice of law analysis. With respect to the first policy consideration ("[the] predictability of result"), the hearing justice observed that "it should not be a surprise to a Rhode Island domiciled corporation that it may be sued in a Rhode Island court, under Rhode Island law, for a product manufactured in Rhode Island." On that basis, she stated that it should be predictable to such a corporation that a Rhode Island statute of limitations would apply.

The hearing justice then looked to the second policy consideration ("the maintenance of interstate order"), and she determined that that factor was "without great significance in the present case." It was the hearing justice's view that the law and policy concerns of Massachusetts "would not be offended" by the application of a Rhode Island statute of limitations with respect to a Rhode Island corporation; she added that applying the Rhode Island statute would actually create a "broader protection for the Massachusetts citizen by extending the time for filing claims against such a corporation."

As for the third policy consideration ("simplification of the judicial task"), the hearing justice indicated that the application of the statute of limitations of either jurisdiction could simplify the judicial task—depending upon how narrowly or broadly the factor was applied. It was her view that application of the Massachusetts statute of limitations could simplify the judicial task because it would require plaintiff either to go to trial on its original theory or dismiss its complaint. According to the hearing justice, applying a Massachusetts statute of limitations would "salvage the [c]ourt's time spent on Plaintiff's gasket theory and limit the [c]ourt's future tasks relative to this case." The hearing justice further stated, however, that it would also "be no great challenge for this [c]ourt to apply Rhode Island's own statute of limitations and [the] Rule 15 discovery/relation-back test as well as its own governing law on products liability."

With respect to the fourth policy consideration ("advancement of the forum's governmental interests"), the hearing justice noted that neither party had set forth any particular governmental interests that would be advanced by the application of the law of either jurisdiction. She nonetheless observed that it would "seem quite obvious * * * that Massachusetts would not have a strong governmental interest in precluding one of its citizens from redress-

ing tortious conduct that caused property damage within the [Commonwealth's] borders." She also remarked that Massachusetts would not have a governmental interest in protecting Rhode Island citizens from lawsuits. On the other hand, in considering Rhode Island's governmental interests, she determined that Rhode Island would have a strong governmental interest in applying its own statute of limitations to actions commenced in a Rhode Island forum when one of the parties is domiciled in this state.

Finally, the hearing justice addressed the fifth policy consideration ("the better rule of law"). She determined that the "better" rule of law was that of Rhode Island. While she noted that a ten-year statute of limitations "may not be as efficient in the court system," it was nonetheless her view that a longer limitations period "affords more protection for those who suffer property damage resulting from defective products." The hearing justice also commented that Rhode Island's different limitations periods for personal injury cases as contrasted with property damage cases suggested that the Rhode Island law was the product of more thoughtful deliberation and was the better rule. She explained the latter point as follows:

> "Rhode Island's allowance of a ten-year period where the harm done is limited to property damage shows greater thought in protecting both plaintiffs and defendants. Personal injury claims [ought] to have a shorter tolling period for obvious reasons. The better rule is to extend the limitations period for property damage cases, cases that don't suffer the same vagaries of proof as bodily injury cases."

### 5. The Hearing Justice's Conclusion

Having weighed the several tort factors as well as the policy considerations, the hearing justice concluded that Rhode Island's ten-year statute of limitations should apply. She summarized her analysis as follows:

> "To sum up, in looking at the tort factors, it seems that Rhode Island has a somewhat superior interest in the case, notwithstanding that the harm occurred in Massachusetts. However, when taken together with the other conflict of law factors, the other factors, it seems plain enough that Rhode Island has an interest superior to that of Massachusetts in applying its own statute of limitations." [21]

The hearing justice concluded the July 9, 2009 hearing by granting Harodite's motion for a stay.

### F

### Harodite's Petition for Issuance of Writ of Certiorari

Harodite filed a petition for issuance of writ of certiorari with this Court on July 22, 2009; that petition was granted on December 22, 2009. In the order granting Harodite's petition, the parties were also directed to address the issue of "whether the Rhode Island or Massachusetts statute of limitations is applicable to the claims asserted by the petitioner in its proposed amended complaint."

Before us, Harodite contends: (1) that it was an abuse of discretion for the Superior Court to deny the motion to amend its complaint; (2) that, under any analysis, Rhode Island's statute of limitations should apply; (3) that the vast majority of

---

**21.** When, in the passage quoted in the text, the hearing justice mentioned "the other conflict of law factors," we understand that to be a reference to what we have characterized as the five "policy considerations." *See* footnote 20, *supra.*

states treat statutes of limitation as procedural and apply the forum's statute to common law causes of action that accrued elsewhere; and (4) that the claims set forth in the proposed amended complaint "relate back" to the filing of the initial complaint pursuant to Rule 15(c).

For its part, Warren Electric contends: (1) that the Superior Court did not abuse its discretion in denying plaintiff's inexcusably delayed motion to amend; (2) that Massachusetts statutes of limitations should apply because Massachusetts bears the most significant relationship "to the oil spill, the conduct that allegedly caused [the spill,] and [to] the parties;" (3) that, even though the Superior Court erred in concluding that Rhode Island law applies, the Superior Court correctly applied the interest-weighing approach to the statute of limitations analysis; and (4) that, if the Massachusetts statutes of limitations apply, Harodite's proposed amendment should be denied as futile.

## II

### Standard of Review

When considering issues brought before us pursuant to a writ of certiorari, "this Court conducts a *de novo* review with respect to all applicable questions of law." *Lynch v. Rhode Island Department of Environmental Management,* 994 A.2d 64, 70 (R.I.2010) (internal quotation marks omitted). As such, our review "is restricted to an examination of the record to determine whether any competent evidence supports the decision and whether the decision maker made any errors of law in that ruling." *Cadillac Lounge, LLC v. City of Providence,* 913 A.2d 1039, 1042 (R.I.2007) (quoting *Asadoorian v. Warwick School Committee,* 691 A.2d 573, 577 (R.I.1997)).

We have on numerous occasions stated that the decision to grant or to deny a motion to amend a complaint is confided to the sound discretion of the hearing justice. *See, e.g., Barrette v. Yakavonis,* 966 A.2d 1231, 1236 (R.I.2009); *Medeiros v. Cornwall,* 911 A.2d 251, 254 (R.I.2006); *Manocchia v. Narragansett Capital Partners Television Investments,* 658 A.2d 907, 909 (R.I.1995). Accordingly, we afford "great deference to the trial justice's ruling on a motion to amend." *Catucci v. Pacheco,* 866 A.2d 509, 513 (R.I.2005) (internal quotation marks omitted). In conducting our review of such rulings, we "will not disturb [the] ruling unless the hearing justice committed an abuse of discretion." *Barrette,* 966 A.2d at 1236; *see also Medeiros,* 911 A.2d at 254; *Manocchia,* 658 A.2d at 909.

Although, to the best of our knowledge, this Court has never indicated in so many words precisely what standard of review applies to a trial court's ruling as to a choice of law issue, our case law is replete with instances in which we in effect reviewed same on a *de novo* basis. *See, e.g., Najarian v. National Amusements, Inc.,* 768 A.2d 1253, 1255 (R.I.2001); *Cribb v. Augustyn,* 696 A.2d 285, 288 (R.I.1997).[22] We would note, however, that, at

---

**22.** It is noteworthy that several federal courts of appeals have also indicated that certain choice of law determinations should be reviewed in a *de novo* manner. *See, e.g., Jasty v. Wright Medical Technology, Inc.,* 528 F.3d 28, 39 (1st Cir.2008) ("We review choice of law determinations de novo."); *Mayo v. Hartford Life Insurance Co.,* 354 F.3d 400, 403 (5th Cir.2004) ("This court reviews *de novo* a dis-

trict court's choice of law determination."); *LaFarge Corp. v. Travelers Indemnity Co.,* 118 F.3d 1511, 1514–15 (11th Cir.1997) ("[T]he question of which state's substantive law applies in this diversity action is a legal question entitled to independent review on appeal."); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 956 (10th Cir.1992) ("The enforceability of forum selection, choice of

least in cases such as this one, which sound in tort (where the hearing justice must not only weigh the policy considerations but must also conduct an application of the tort factors), our standard of review must correlate to the disparate nature of the two applicable analyses: the analysis of the tort factors requires fact-finding, whereas the analysis of the policy considerations is legal in nature. In other words, the hearing justice's application of the tort factors necessarily calls for findings of fact and resolution of mixed questions of fact and law, which we review under the clearly erroneous standard. *See Associated Builders & Contractors of Rhode Island, Inc. v. Department of Administration,* 787 A.2d 1179, 1184 (R.I. 2002). By contrast, the analysis of the policy considerations involves a pure issue of law, which we review in a *de novo* manner. *See id.*[23]

### III

### Analysis

### A

### The Denial of Harodite's Motion to Amend Its Complaint

In contending that the hearing justice abused her discretion in denying its motion to amend its complaint, Harodite sets forth two multi-faceted arguments: (1) that Harodite could not have amended its complaint earlier because the substance of its amendments was derived from Warren Electric's supplemental answers to interrogatories that were served on March 26,

2009 and (2) that Warren Electric "has not shown the kind of prejudice that justifies denial of the motion." By contrast, with respect to its argument that the hearing justice did not abuse her discretion in denying the motion, Warren Electric contends: (1) that Warren Electric showed that it would suffer substantial prejudice if the amendment were allowed only days before trial[24] and (2) that Harodite had no valid reason for its delay in seeking to amend the complaint.

Rule 15(a) provides in pertinent part as follows:

"(a) *Amendments.* A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served * * *. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

In interpreting Rule 15(a), this Court has observed that the "true spirit of the rule is exemplified" by the words "and leave shall be freely given when justice so requires." *Medeiros,* 911 A.2d at 253 (quoting *Ricard v. John Hancock Mutual Life Insurance Co.,* 113 R.I. 528, 540, 324 A.2d 671, 677 (1974)); *see also Inleasing Corp. v. Jessup,* 475 A.2d 989, 992 (R.I.1984) ("We have held that it is this final [clause] of the rule which embodies its true spirit."). In abiding by the "true spirit" of Rule 15, we have "consistently held that trial justices should liberally allow amendments to the plead-

law[,] and arbitration provisions are questions of law which we review de novo."). *See generally* Wright and Miller, *Federal Practice and Procedure: Civil 3d* § 2446 (2008).

23. Such a two-tiered approach to the standard of review is by no means unusual in our law. *See, e.g., City of Providence v. Employee Retirement Board of Providence,* 749 A.2d 1088, 1093 (R.I.2000) ("While we recognize

that the determination of issue preclusion by virtue of collateral estoppel is generally a question of law, we also recognize that in making that determination a motion hearing justice is permitted to make findings of fact to support his or her determination.").

24. *See* footnote 13, *supra.*

ings." [25] *Medeiros,* 911 A.2d at 253 (quoting *Serra v. Ford Motor Credit Co.,* 463 A.2d 142, 150 (R.I.1983)); *see also Manocchia,* 658 A.2d at 909 ("It is well settled in Rhode Island that amendments under [Rule 15] are allowed with liberality.").[26] Accordingly, although we are mindful that the decision as to whether or not to grant leave to amend is confided to the sound discretion of the hearing justice, we note that that discretion is *inherently constrained* by the plain language of Rule 15(a) and our cases interpreting same; the proverbial scales are tipped at the outset in favor of permitting the amendment.

▬ As we have previously stated, "Rule 15(a) * * * liberally permits amendment absent a showing of extreme prejudice." *Weybosset Hill Investments, LLC v. Rossi,* 857 A.2d 231, 236 (R.I.2004) (internal quotation marks omitted). It follows that "[t]he question of prejudice to the party opposing the amendment is central to the investigation into whether an amendment should be granted." *Faerber v. Cavanagh,* 568 A.2d 326, 329 (R.I.1990). And with respect to a party's delay in moving to amend, we have previously stated that, "mere delay is an insufficient reason to deny an amendment." *Wachsberger v. Pepper,* 583 A.2d 77, 79 (R.I.1990); *see Inleasing Corp.,* 475 A.2d at 992. Rather, it is incumbent upon the hearing justice to "find that such delay creates substantial prejudice to the opposing party." *Wachsberger,* 583 A.2d at 79. At the same time, it should also be borne in mind that we have explicitly observed that "the risk of substantial prejudice generally increases with the passage of time." *RICO Corp. v. Town of Exeter,* 836 A.2d 212, 218 (R.I. 2003). In other words, there comes a point when delay becomes "undue and excessive," and "causes prejudice to the opposing party." *See Faerber,* 568 A.2d at 329 ("Although we have ruled that mere delay is not enough to deny the amendment, undue and excessive delay that causes prejudice to the opposing party is grounds for denial.") (internal citation omitted).

In *Faerber,* 568 A.2d at 329, this Court undertook an examination of what constitutes "undue delay." In carrying out that task, we quoted with approval the following burden-focused observation of the United States Court of Appeals for the First Circuit in *Carter v. Supermarkets General Corp.,* 684 F.2d 187 (1st Cir.1982):

> "With respect to undue delay, * * * where ... a considerable period of time has passed between the filing of the complaint and the motion to amend, *courts have placed the burden upon the movant* to show some valid reason for his neglect and delay." *Carter,* 684 F.2d at 192 (emphasis added) (internal quotation marks omitted).

---

**25.** In *Medeiros v. Cornwall,* 911 A.2d 251, 253–54 (R.I.2006), we noted that the Supreme Court of the United States had similarly interpreted identical language in Rule 15(a) of the Federal Rules of Civil Procedure. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.") (internal citation omitted).

**26.** We have stated that liberally allowing amendments serves the purpose of "facilitat[ing] the resolution of disputes on their merits rather than on blind adherence to procedural technicalities." *Wachsberger v. Pepper,* 583 A.2d 77, 78 (R.I.1990); *see also Inleasing Corp. v. Jessup,* 475 A.2d 989, 992 (R.I.1984) ("[W]e have emphasized the desirability of permitting the desired amendments and having the dispute resolved on its merits and not by a blind adherence to procedural technicalities.").

In *Faerber,* 568 A.2d at 330, we then proceeded to examine the explanation proffered by the movant in that case, and we found that explanation to be "simply not sufficient." We also held in *Faerber* that substantial prejudice inured to the opposing party because the amendment "would have involved a considerable amount of new discovery." *Id.*

■■■ In the present case, we perceive nothing in the record to suggest that Harodite has established a reasonable explanation for its delay in moving to amend the original complaint. As previously discussed, Harodite's proposed amended complaint sets forth three substantive additions to the original complaint: (1) it added an allegation that the gasket was *not properly centered* to its original allegation that the gasket was *oversized;* (2) it added to the defect in design count a new allegation about the lack of a fail-safe system; and (3) it added an entirely new count alleging failure to warn.

Our review of the record makes it completely clear to us that plaintiff Harodite had ample opportunity to amend its complaint long before filing a motion to that effect on April 23, 2009. With respect to the proposed additional allegation regarding the *improper centering* of the gasket, the summary of facts in Harodite's own brief suggests that it could have amended its complaint at least as early as November of 2007. (It will be recalled that it was at that time that Harodite's supplemental answers to Acadia Elastomers' interrogatories indicated that Dr. Ali M. Sadegh was prepared to testify that the gasket may not have been properly centered. *See* section "I B 2" of this opinion, *supra.*) With respect to the other two proposed additions, a review of the record in its entirety indicates that Harodite's delay was the product of a protracted discovery process, in which both parties refrained at times from sharing information for as long as possible. However, the record also reflects that Harodite bears particular responsibility for its delay in providing adequate responses to Warren Electric's interrogatories and requests for production of documents—which discovery (the RALCO invoice in particular) provided Warren Electric with the informational basis upon which it supplemented its interrogatories in March of 2009.

It is further our opinion that the hearing justice did not abuse her discretion in determining that Warren Electric would be prejudiced by the granting of plaintiff's motion to amend its complaint. In reaching that conclusion, we have been struck by the similarity between the situation before the hearing justice in this case and the situation at issue in *Weybosset Hill Investments, LLC.* The following extract from this Court's opinion in that case is particularly pertinent to the case at bar:

> "The plaintiff may well have been extremely prejudiced had the city been granted leave to amend, considering the *lateness* of defendant's motion, its *proximity* to trial, and the *significant work* plaintiff would have needed to undertake to prepare for the new legal issue." *Weybosset Hill Investments, LLC,* 857 A.2d at 237 (emphasis added) (internal quotation marks omitted).

In the instant case, the hearing justice predicated her denial of Harodite's motion to amend on essentially the same reasoning as we employed in *Weybosset Hill Investments, LLC,* in which we affirmed a hearing justice's denial of a motion to amend. The hearing justice in the instant case pointed to: (1) Harodite's delay in filing the motion to amend; (2) the proximity of the motion to trial; and (3) the extent to which Warren Electric would have to undertake additional discovery, retain new experts, and reconsider its previ-

ously developed trial strategy in order to defend against the new allegations.

During the hearing of July 9, 2009, the hearing justice thoughtfully and candidly explained how close a call she considered to have been her ruling of two months earlier on the motion to amend. She stated in pertinent part as follows:

> "I remain satisfied that it was no abuse of discretion for me to deny the motion to amend the complaint which was filed on the [eve] of trial, a motion that sought to supplant the existing complaint which undoubtedly would trigger the need for substantial discovery. * * * On the other hand, allowing the amended complaint would not necessarily have been an abuse of discretion either, in view of the determination I've just made on choice and conflicts of law and in spite of the fact that allowing the amended complaint would have invited a very messy record in discovery proceedings * * *."

Having carefully considered the entire record, we are of the same mind; there are legitimate arguments in favor both of denying the motion to amend and in favor of granting same. However, in view of the abuse of discretion standard of review, we are unable to say that the hearing justice abused her discretion in ruling as she did. The issue, of course, is *not* what ruling a member of this Court might have made if he or she were confronted with the motion to amend at the trial court level. The only issue properly before us is whether the hearing justice abused her discretion in ruling as she did, and we hold that she did not. *See State v. Gillespie,* 960 A.2d 969, 980 (R.I.2008) ("[W]e may uphold a trial justice's ruling even if we would have ruled differently had we been in the trial justice's position."); *North Providence School Committee v. North Providence Federation of Teachers, Local 920, American*

*Federation of Teachers,* 945 A.2d 339, 345 n. 10 (R.I.2008); *see also National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) ("The question, of course, is not whether this Court, or whether the Court of Appeals, would as an original matter have dismissed the action; it is whether the District Court abused its discretion in so doing."); *State v. Gongoleski,* 14 A.3d 218, 222 (R.I.2011).

Finally, although many of our decided cases have emphasized the liberal spirit in which motions to amend should be considered, there exists a competing policy concern that strikes us as being particularly relevant to the instant case. In *Faerber,* we stated the following:

> "[T]he trial justice's discretional authority to deny amendments to pleadings when delay is involved must always be placed within the scope of the spirit of the Superior Court Rules of Civil Procedure: 'They shall be construed to secure the *just, speedy,* and *inexpensive* determination of every action.'" *Faerber,* 568 A.2d at 329 (emphasis added) (quoting Rule 1 of the Superior Court Rules of Civil Procedure).

Taking into account all of the above-summarized factual and legal considerations, we hold that the hearing justice in the instant case did not abuse her discretion in denying Harodite's motion to amend its complaint. *See id.*

### B

### The Hearing Justice's Choice of Law Ruling

Pursuant to the order of this Court granting the petition for writ of certiorari, the parties have also briefed the question of whether a statute of limitations of Massachusetts or of Rhode Island should apply with respect to the allegations in plaintiff's proposed amended complaint. Our review

of the hearing justice's ruling in this regard is greatly facilitated by the commendably precise manner in which she passed upon the relevant tort factors and policy considerations. (*See* section "I E" of this opinion, *supra.*)

■■■■ With respect to choice of law questions, this Court has adopted the "interest-weighing" approach. *Woodward v. Stewart*, 104 R.I. 290, 299, 243 A.2d 917, 923, *cert. dismissed*, 393 U.S. 957, 89 S.Ct. 387, 21 L.Ed.2d 371 (1968); *see also La Plante v. American Honda Motor Co.*, 27 F.3d 731, 741 (1st Cir.1994); *Najarian*, 768 A.2d at 1255. In carrying out that approach, "we look at the particular * * * facts and determine therefrom the rights and liabilities of the parties in accordance with the law of the state that bears the *most significant relationship* to the event and the parties." *Cribb*, 696 A.2d at 288 (emphasis added) (internal quotation marks omitted). In *Woodward*, 104 R.I. at 300, 243 A.2d at 923, we set forth the policy considerations which must be taken into account in making this determination as follows:

"(1) Predictability of results.

"(2) Maintenance of interstate and international order.

"(3) Simplification of the judicial task.

"(4) Advancement of the forum's governmental interests.

"(5) Application of the better rule of law." [27]

In addition, in a case sounding in tort, we held in *Brown v. Church of the Holy Name of Jesus*, 105 R.I. 322, 326–27, 252 A.2d 176, 179 (1969), that the following additional factors are to be considered:

"'(a) the place where the injury occurred,

"(b) the place where the conduct causing the injury occurred,

"(c) the domicil [*sic*], residence, nationality, place of incorporation and place of business of the parties, and

"(d) the place where the relationship, if any, between the parties is centered.'" [28]

### 1. The Tort Factors

■■■ Based upon a thorough review of the entire record, and given the deferential standard of review applicable to the fact-finding that is inherent in the tort factors portion of the hearing justice's analysis, we conclude that the hearing justice correctly evaluated the appropriate factors. We also do not perceive any basis to conclude that the hearing justice overlooked or misconceived any material evidence or was clearly wrong in reaching her conclusion that "[e]ver so slightly, * * * the tort factors weigh in favor of applying Rhode Island law * * *."

### 2. The Policy Considerations

Although we review the hearing justice's analysis with respect to the policy considerations in a *de novo* manner, we perceive no reason to replicate the hearing justice's thoughtful analysis of those five policy considerations that were first announced over forty years ago in *Woodward*. (*See* section "I E 4" of this opinion, *supra.*) We have nothing to add to that analysis, with which we are in complete accord. We would pause, however, to express our particular agreement with the hearing justice's analysis of the fifth policy consider-

---

**27.** *See also Najarian v. National Amusements, Inc.*, 768 A.2d 1253, 1255 (R.I.2001).

**28.** The passage from *Brown v. Church of the Holy Name of Jesus*, 105 R.I. 322, 326–27, 252 A.2d 176, 179 (1969), that is quoted in the text is a quotation from the Restatement (Second) *Conflicts* § 145(2) (Proposed Official Draft 1968). *See also Najarian*, 768 A.2d at 1255.

ation—"the better rule of law." To the extent that a particular jurisdiction chooses to have a longer limitations period for certain types of cases, it appears entirely reasonable to distinguish between personal injury cases and property damage cases— the latter being cases which, in the words of the hearing justice, do not "suffer the same vagaries of proof as bodily injury cases."

### 3. The Choice of Law Conclusion

Having conducted our review of all of the factors and the policy considerations that must be taken into account pursuant to our interest-weighing approach, we conclude that the hearing justice correctly determined that Rhode Island bears the most significant relationship to the allegations set forth in Harodite's proposed amended complaint. For that reason, Rhode Island's ten-year statute of limitations would be the relevant statute of limitations with respect to the allegations set forth in Harodite's proposed amended complaint, and, therefore, those allegations would not be barred by the statute of limitations.[29] *See Najarian*, 768 A.2d at 1255; *Cribb*, 696 A.2d at 288.

### IV

### Conclusion

For the reasons set forth in this opinion, we affirm the rulings of the Superior Court. The record in this case may be returned to that tribunal.

Justice FLAHERTY, with whom Justice INDEGLIA joins, dissenting in part and concurring in the result.

We write separately because we believe that this Court is passing on an opportunity to bring our jurisprudence in line with a substantial majority of jurisdictions in this country by announcing that statutes of limitations are procedural in nature and thus the law of the forum state controls.[30] Such a pronouncement would eliminate the need for parties, trial courts, and this Court to conduct torturous interest-weighing tests on what are clearly procedural questions that inevitably lead to inconsistent and unpredictable results and undermine judicial efficiency.

### I

### The Interest–Weighing Approach in Rhode Island

When a claim originates in one state (the claim state) but is brought before a court of another state (the forum state), the forum state must conduct a thorough analysis to determine which state's laws should govern the suit.[31] At present, Rhode Island jurists perform this pains-

---

**29.** In view of the fact that we rest our determination of the choice of law issue on this jurisdiction's traditional interest-weighing approach, we need not and therefore do not reach the other arguments set forth by the parties. *See Grady v. Narragansett Electric Co.*, 962 A.2d 34, 42 n. 4 (R.I.2009) (noting this Court's "usual policy of not opining with respect to issues about which we need not opine"); *see also Furlan v. Farrar*, 982 A.2d 581, 585 (R.I.2009).

**30.** In this case, respondent, Warren Electric Corp., contends that the trial justice properly used the interest-weighing approach to deter-

mine whether Massachusetts' or Rhode Island's statute of limitations controlled, but further contends that the trial justice incorrectly concluded after weighing the interests that Rhode Island law applied. By contrast, Harodite Industries, Inc. asserts that Rhode Island should follow the "vast majority of states" that treat statutes of limitations as procedural and apply the forum state's statute of limitations.

**31.** The majority well and thoroughly describes the application of the interest-weighing approach. We need not repeat it here.

taking analysis on an *ad hoc* basis by employing the interest-weighing approach. The application of that analysis to determinations of which statute of limitations to apply somehow has morphed from the language used by this Court in its 1968 decision in *Woodward v. Stewart*, 104 R.I. 290, 243 A.2d 917 (1968). In *Woodward*, this Court abandoned its long adherence to the rule that the place of a tort shall govern the rights of the injured party.[32] *Id.* at 299, 243 A.2d at 923. In lieu of that rule, the Court chose to adopt an interest-weighing approach whereby an action is separated into its various elements and each individual element or issue is governed by the law of the jurisdiction that has the most significant contacts relative thereto. *Id.* at 293, 243 A.2d at 919–20. The former approach (known as the *lex loci delicti* doctrine) was a subjective determination of whether a particular element was labeled as substantive or procedural that often controlled which law would be applied. *Id.* at 295, 243 A.2d at 920–21. Classifying an element as substantive or procedural was a subjective determination, in part, because "the guidelines used in making such determinations were not very often open to objective classification or criticism." *Id.*, 104 R.I. at 295, 243 A.2d at 921. The *Woodward* Court noted,

"when a court met a hard case in which it had to decide whether a particular matter was substantive or procedural—and there was a serious question raised as to which label to apply—the courts found that they had considerable latitude to characterize the matter as procedural and govern the case by the law of the forum." *Id.* at 295, 243 A.2d at 921.

It is noteworthy, however, that the application of statutes of limitations cannot seriously be considered to be within the class of "hard cases" referred to by the Woodward Court because statutes of limitations historically have been viewed as procedural and are viewed as procedural today by a vast majority of states. *See* Part II, *infra.* Moreover, in adopting the interest-weighing approach, the Court in *Woodward* intimated the application of that approach would be limited to instances where the Court first had to determine whether the element in question was clearly not procedural. *See id.* at 298, 243 A.2d at 922. This is simply not the case with respect to statutes of limitations. *Woodward*, therefore, did not in any way overturn the long-held application of the forum state's statute of limitations adopted in *Byron v. Great American Indemnity Co.*, 54 R.I. 405, 407–08, 173 A. 546, 547 (1934), and *Staples v. Waite*, 30 R.I. 516, 519, 76 A. 353, 354 (1910) ("[N]o rule is better settled than that the statute of limitations of the state in which the action is brought, is to prevail \* \* \*."). Indeed, in discussing the application of the theory to cases being litigated under common law (as opposed to statutory law) the *Woodward* Court held that "[o]nce a forum has established sufficient interests to warrant applying its own *substantive* laws to a given issue, \* \* \* it follows that the forum is warranted in applying its own substantive laws whether those laws are based on common-law rights, or whether they depend totally upon statutory enactment for their existence." *Woodward*, 104 R.I. at 298, 243 A.2d at 922 (emphasis added).

In 1997, this Court expanded the interest-weighing approach upon determining whether the Rhode Island or New Hamp-

---

**32.** In *Woodward v. Stewart*, 104 R.I. 290, 243 A.2d 917 (1968), the Court considered whether Rhode Island tort law, specifically the Wrongful Death Act, applied to a car accident between Rhode Island residents that occurred in Massachusetts.

shire statute of limitations controlled in *Cribb v. Augustyn,* 696 A.2d 285, 288 (R.I. 1997). In doing so, the Court summarily—and incorrectly in our opinion—concluded that the doctrine of *lex loci delicti* had been wholly abandoned in this jurisdiction without considering whether *Woodward* intended to limit the interest-weighing approach to cases where there was a serious question whether the issue was procedural or substantive. With all due respect, it is our opinion that the majority has extended the error in *Cribb* with its holding in this case.

## II

### Statutes of Limitations Are Clearly Procedural

In determining whether statutes of limitations are best described as procedural or substantive, the meaning of those terms is instructive. Black's Law Dictionary 1567 (9th ed. 2009) defines substantive law as "[t]he part of the law that creates, defines, and regulates the rights, duties, and powers of parties." On the other hand, procedural law is confined to those rules "that prescribe the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties themselves." Black's Law Dictionary at 1323. Black's quotes John Salmond on the distinctions between the two, saying: "So far as the administration of justice is concerned with the application of remedies to violated rights, we may say that the substantive law defines the remedy and the right, while the law of procedure defines the modes and conditions of the application of the one to the other." Black's Law Dictionary at 1567 (quoting John Salmond, *Jurisprudence* 476 (Glanville L. Williams ed., 10th ed. 1947)).

Although its holdings are not controlling on this Court, we are persuaded by the logic of the United States Supreme Court

in *Sun Oil Co. v. Wortman,* 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988). In that case, the Court discussed whether the United States Constitution's Full Faith and Credit Clause allowed states to employ their own choice of law rules to determine whether the forum state's or the claim state's statute of limitations applied in a given case. *Id.* at 722–30, 108 S.Ct. 2117. Justice Scalia, writing for the Court in *Sun Oil Co.,* commented that viewing statutes of limitations as procedural (rather than as substantive) predates the Constitution itself. *Id.* at 723, 108 S.Ct. 2117.

"The historical record shows conclusively, we think, that the society which adopted the Constitution did not regard statutes of limitations as substantive provisions, akin to the rules governing the validity and effect of contracts, but rather as procedural restrictions fashioned by each jurisdiction for its own courts. As Chancellor Kent explained in his landmark work, 2 J. Kent, Commentaries on American Law 462–463 (2d ed. 1832): 'The period sufficient to constitute a bar to the litigation of sta[l]e demands, is a question of municipal policy and regulation, and one which belongs to the discretion of every government, consulting its own interest and convenience.'" *Sun Oil Co.,* 486 U.S. at 726, 108 S.Ct. 2117.

In *Sun Oil,* the Court determined that if statutes of limitations were understood to be procedural, then the forum state could apply its own statute of limitations. In the course of that analysis the Court opined:

"Since the procedural rules of its courts are surely matters on which a State is competent to legislate, it follows that a State may apply its own procedural rules to actions litigated in its courts. The issue * * * can be characterized as whether a statute of limitations may be considered as a procedural matter for

purposes of the Full Faith and Credit Clause." [33]  *Id.* at 722–23, 108 S.Ct. 2117.

The Court went on to state:

"[The] view of statutes of limitations as procedural for purposes of choice of law followed quite logically from the manner in which they were treated for domestic-law purposes. At the time the Constitution was adopted the rule was already well established that suit would lie upon a promise to repay a debt barred by the statute of limitations—on the theory, as expressed by many courts, that the debt constitutes consideration for the promise, since the bar of the statute does not extinguish the underlying right but merely causes the remedy to be withheld." *Id.* at 725, 108 S.Ct. 2117.

In concluding that forum states were not required to apply the statute of limitations of claim states, the Court reasoned that because the statute of limitations "does not extinguish the underlying right but merely causes the remedy to be withheld," it is procedural in nature. *Id.* at 725, 108 S.Ct. 2117 (citing *Little v. Blunt,* 26 Mass. 488,

492 (1830) and *Wetzell v. Bussard,* 24 U.S. (11 Wheat.) 309, 311, 6 L.Ed. 481 (1826)). The Court went on to discuss *Graves v. Graves' Executors,* 5 Ky. 207, 208–09 (1810), which held that "[t]he statute of limitations * * * does not destroy the right but withholds the remedy. It would seem to follow, therefore, that the *lex fori,* and not the *lex loci* was to prevail with respect to the time when the action should be commenced." [34]  Thus, American jurisprudence long has understood that statutes of limitations are best categorized as procedural in nature.

## III

### A Majority of Other Jurisdictions Apply the Statute of Limitations of the Forum State

Finally, because serving the interests of judicial economy and predictability weigh strongly in favor of adopting an unclouded and simple rule on statutes of limitations, a majority of other states have decided that statutes of limitations are procedural, and therefore controlled by the law of the forum state. [35]  Most states have held that there simply is no need for courts to en-

**33.** The Court earlier had articulated that statutes of limitations were procedural in *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 778 n. 10, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) ("Under traditional choice-of-law principles, the law of the forum State governs on matters of procedure").

**34.** In this way, statutes of limitations can be distinguished from statutes of repose. It is possible that statutes of repose might indeed be considered substantive for choice of law purposes because they

"limit[ ] the time within which an action may be brought and [are] not related to the accrual of any cause of action; the injury need not have occurred, much less have been discovered. Unlike an ordinary statute of limitations which begins running upon accrual of the claim, the period contained in a statute of repose begins when a specific event occurs, regardless of whether a cause of action has accrued or whether

any injury has resulted." Black's Law Dictionary 1546 (9th ed. 2009) (quoting 54 C.J.S. *Limitations of Actions* § 4 at 20–21 (1987)).

Indeed, Black's Law Dictionary defines statute of repose as "[a] statute barring any suit that is brought after a specified time since the defendant acted (such as by designing or manufacturing a product), even if this period ends before the plaintiff has suffered a resulting injury." Black's Law Dictionary at 1546.

**35.** *See, e.g., Hartford Underwriters Insurance Co. v. Foundation Health Services, Inc.,* 524 F.3d 588, 593 (5th Cir.2008) (interpreting Mississippi law); *Mackey v. Judy's Foods, Inc.,* 867 F.2d 325, 328 (6th Cir.1989) (interpreting Tennessee law); *Sokolowski v. Flanzer,* 769 F.2d 975, 978 (4th Cir.1985) (interpreting Maryland law); *Player Pianette, Inc. v. Dale Electronics, Inc.,* 478 F.2d 336, 336–37 (8th Cir.1973) (interpreting Nebraska law); *Mahalsky v. Salem Tool Co.,* 461 F.2d 581,

gage in the harrowing multistep process of weighing the parties' interests when the states have such compelling reasons to employ their own procedural rules.

Although states articulate the rule with some variations, there can be no serious argument that there is general consensus across the country that states should apply their own statutes of limitations because they are procedural in nature. Rhode Island should rejoin this overwhelming majority of jurisdictions and restore the centuries-old rule providing that because statutes of limitations are procedural, the law of the forum state controls. With enormous respect for the opinion of the majority, it is nonetheless our opinion that it missed the opportunity to do so in this case. We join in the opinion of the majority in all other respects.

## Conclusion

For the reasons discussed above, we would announce a clear rule that because statutes of limitations are procedural, the law of the forum state should control.

585–86 (6th Cir.1972) (interpreting Ohio law); *Association for the Preservation of Freedom of Choice, Inc. v. Simon*, 299 F.2d 212, 214–15 (2nd Cir.1962) (interpreting New York law); *Pinnacle Pizza Co. v. Little Caesar Enterprises, Inc.*, 560 F.Supp.2d 786, 794–95 (D.S.D.2008) (interpreting South Dakota law); *Gaudreau v. American Promotional Events, Inc.*, 511 F.Supp.2d 152, 157 (D.D.C.2007) (interpreting the law of the District of Columbia); *Norton v. Michonski*, 368 F.Supp.2d 175, 179 (D.Conn.2005) (interpreting Connecticut law); *Glover v. Merck & Co.*, 345 F.Supp.2d 994, 998–99 (D.Minn.2004) (interpreting Minnesota law); *Bailey v. Skipperliner Industries, Inc.*, 278 F.Supp.2d 945, 952 (N.D.Ind.2003) (interpreting Indiana law); *Eagle Nation, Inc. v. Market Force, Inc.*, 180 F.Supp.2d 752, 755 (E.D.N.C.2001) (interpreting North Carolina law); *Graphic Technology, Inc. v. Pitney Bowes Inc.*, 968 F.Supp. 602, 605 n. 3 (D.Kan. 1997) (interpreting Kansas law); *Armor v. Michelin Tire Corp.*, 923 F.Supp. 103, 106–07 (S.D.W.Va.1996) (interpreting West Virginia law); *Thornton v. Cessna Aircraft Co.*, 703 F.Supp. 1228, 1230 (D.S.C.1988) (interpreting South Carolina law); *AAMCO Transmissions, Inc. v. Harris*, 759 F.Supp. 1141, 1143 (E.D.Pa.1991) (interpreting Pennsylvania law); *Hines v. Tenneco Chemicals, Inc.*, 546 F.Supp. 1229, 1232–33 (S.D.Tex.1982) (interpreting Texas law); *Holdford v. Leonard*, 355 F.Supp. 261, 263 (W.D.Va.1973) (interpreting Virginia law); *White v. Fawcett Publications*, 324 F.Supp. 403, 405 (W.D.Mo.1971) (interpreting Missouri law); *Middleton v. Lockhart*, 355 Ark. 434, 139 S.W.3d 500, 503 (2003) (Arkansas); *Cossman v. DaimlerChrysler Corp.*, 108 Cal.App.4th 370, 133 Cal.Rptr.2d 376, 380 (2003) (California); *Butts v. Thomas*, 300 Ga.App. 639, 686 S.E.2d 262, 263 (2009) (Georgia); *Newell Co. v. Petersen*, 325 Ill. App.3d 661, 259 Ill.Dec. 495, 758 N.E.2d 903, 908 (2001) (Illinois); *Hossler v. Barry*, 403 A.2d 762, 765 (Maine 1979) (Maine); *Gordon v. Gordon*, 118 N.H. 356, 387 A.2d 339, 342 (1978) (New Hampshire); *Nez v. Forney*, 109 N.M. 161, 783 P.2d 471, 472, 473 (1989) (New Mexico); *Consolidated Grain & Barge Co. v. Structural Systems, Inc.*, 212 P.3d 1168, 1171–78 (Okla.2009) (noting that Oklahoma recognizes the general rule though the state's borrowing statute has abrogated its application in many instances); *Potomac Leasing Co. v. Dasco Technology Corp.*, 10 P.3d 972, 975 (Utah 2000) (Utah).